UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORANGE COUNTY-POUGHKEEPSIE LIMITED
PARTNERSHIP, d/b/a VERIZON WIRELESS, et al.,

                              Plaintiffs,

              -v-

THE TOWN OF EAST FISHKILL, et al.,

                              Defendants.

Case No. 13-CV-4791(KMK)

OPINION & ORDER

Appearances

Scott P. Olson, Esq.
Young, Sommer, Ward, Ritzenberg, Baker & Moore, LLC
Albany, NY
*Counsel for Plaintiff Orange County-Poughkeepsie
Limited Partnership, d/b/a Verizon Wireless*

Christopher B. Fisher, Esq.
Andrew P. Schriever, Esq.
Anthony B. Gioffre, III, Esq.
Cuddy & Fedder, LLP
White Plains, NY
*Counsel for Plaintiff Homeland Towers, LLC*

Paul Edward Svensson, Esq.
Hodges, Walsh & Slater, L.L.P.
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiffs, Orange County-Poughkeepsie Limited Partnership d/b/a Verizon Wireless

("Verizon") and Homeland Towers, LLC ("Homeland"), bring this Action against Defendants,

the Town of East Fishkill ("East Fishkill") and the Town of East Fishkill Zoning Board of

Appeals (the "Board") (collectively, the "Town"), under Section 704 of the Telecommunications

Act, 47 U.S.C. § 332(c)(7)(B) (the "Telecommunications Act" or the "TCA"), and Article 78 of

the New York Civil Practice Law and Rules, N.Y. C.P.L.R. § 7803 ("Article 78").  Plaintiffs'

claims arise from the Town's denial of Plaintiffs' application for a special permit, together with a

40-foot height variance and a wetland/watercourse disturbance permit, to install a wireless

telecommunication facility.  Plaintiffs move for summary judgment.  For the following reasons,

Plaintiffs' Motion is granted.

## I.  BACKGROUND

### A.  Factual History

#### 1.  The Application

Plaintiff Verizon is licensed by the Federal Communications Commission ("FCC") to

provide wireless telephone services throughout the State of New York, (*see* Pls.' Local Civil

Rule 56.1 Statement ("Pls.' 56.1") ¶ 61 (Dkt. No. 21)); Decl. of Andrew P. Schriever in Supp. of

Pls.' Mot. for Summ. Judgment ("Schriever Decl.") Ex. C, Administrative Record ("Admin. R.")

66, 1471 (Dkt. No. 22)), and Plaintiff Homeland is a business that constructs tower facilities for

personal wireless services, (Pls.' 56.1 ¶ 62).[1]  Plaintiffs seek to construct a new wireless

telecommunications facility consisting of an approximately 150 foot tall monopole (the

"Monopole" or the "Tower") and associated equipment and installations (together the

---

[1] Defendants admit several facts stated in Plaintiffs' Rule 56.1 Statement.  (*See* Defs.'
Resp. to Pls.' Statement of Facts ("Defs.' 56.1 Resp.") (Dkt. No. 25).)  Accordingly, for ease of
reference, the Court cites to Plaintiffs' 56.1 Statement and notes when the relevant facts are in
dispute.

"Facility"), (Pls.' 56.1 ¶ 11; Admin. R. 119, 1491), at 23 Dartantra Drive, Hopewell Junction,

New York, 12533 located in the Town's R-1 (Residential) Zoning District (the "Site"), (Pls.'

56.1 ¶ 7; Admin. R. 1491).

Under the Town of East Fishkill's Zoning Code (the "Code"), a special permit issued by

the Board is required for the construction of a wireless communication facility within the R-1

(Residential) Zoning District.  (Pls.' 56.1 ¶ 8; Defs.' Resp. to Pls.' Statement of Facts ("Defs.'

56.1 Resp.") ¶ 8 (Dkt. No. 25); Schriever Decl. Ex. D, Code ("Code") § 194-78(A).)  Moreover,

as provided by § 194-84(D)(6)(c) of the Code, the maximum height of a freestanding tower in a

residential area is 110 feet.  (Pls.' 56.1 ¶ 10; Code § 194-84(D)(6)(c).)  East Fishkill is serviced

by Verizon, AT&T, Sprint, and T-Mobile wireless service providers.  (Admin R. 689.)

On November 28, 2011, Plaintiffs submitted their joint application with a detailed cover

letter to the Town for a special permit with requests for a 40 foot height variance and a

wetland/watercourse disturbance permit to install the Facility on the Site pursuant to §§ 194-76

through 194-84 of the Code (the "Application").  (Pls.' 56.1 ¶ 3; Admin. R. 22, 33–34.)  In the

Application, Plaintiffs explained that the purpose of constructing the Facility is "to provide

reliable wireless service along the Taconic State Parkway and Route 82 as well as the

surrounding local roads, residences, and businesses located in the vicinity of [the Site]."

(Admin. R. 22.)  Similarly, Plaintiffs asserted that the Facility "will meet the primary objectives

of Verizon Wireless'[s] target area because it will provide reliable wireless signal coverage to a

significant portion of one of Verizon Wireless'[s] critical gaps in service coverage in the Town

of East Fishkill, and offer new and improved service coverage" in three "spectrums."  (*Id.* at 45.)

3

To support their assertions, Plaintiffs relied on a Radio Frequency ("RF") Analysis and Statement of Need, dated November 15, 2011, (the "Initial RF Analysis") prepared by Johnathan Edwards ("Edwards"), a Verizon Wireless Radio Frequency Design Engineer.  (*Id.* at 43, 45–46, 49.)

In the Application, Plaintiffs described the Site as "an approximately sixteen (16) acre property . . . consisting of underdeveloped forested land and a small wetland area and associated intermittent watercourse along its northern portion."  (*Id.* at 22.)  The Application explained that the Monopole "will be engineered to accommodate [the Facility], as well as the future co-location of up to five (5) additional wireless carriers."  (*Id.* at 22–23.)  Plaintiffs proposed to install twelve panel antennas at a centerline height of approximately 146 feet above grade level ("AGL") on the Monopole (the "Antennas"), as well as an associated unmanned equipment shelter and a Global Positioning Satellite ("GPS") system within the fenced-in compound.  (Pls.' 56.1 ¶ 12; Admin. R. 23, 1492.)  The Monopole is situated within an associated 65 foot by 78 foot fenced compound.  (Pls.' 56.1 ¶ 11.)[2]

Plaintiffs explained to the Board how, in their view, the Facility and the Site conformed with the Code and the Telecommunications Act.  (Admin. R. 23–24.)  Plaintiffs advised the Board that "[b]ased on an extensive search of the area, [Plaintiffs] have confirmed that there are no available existing tall structures or towers that meet Verizon's radio frequency needs for purposes of providing reliable wireless coverage to the targeted area in the Town."  (*Id.* at 24.)

---

[2] Defendants admit that the fenced-in compound is 65 foot by 78 foot, (Defs.' 56.1 Resp. ¶ 11), but note in their statement of facts that the compound is 68 foot by 75 foot, (Defs.' 56.1 ¶ 1).  This inconsistency is not material.

To support their conclusion, Plaintiffs submitted a Site Selection and Alternate Site Analysis,

prepared by Homeland (the "ASA").  (*Id.* at 121–25.)  The ASA listed three alternative existing

structures and ten alternative new tower sites that were evaluated, and concluded that "the

proposed Site was selected as the optimal location because it met the criterion for site selection

better than any other available property in the geographic area where the need for wireless

service exists."  (*Id.* at 124).

Plaintiffs also advised the Board that because of its location and surrounding vegetation,

the Facility "has been designed and sited with the goal of minimizing potential impacts on the

surrounding area."  (Pls.' 56.1 ¶ 14; Admin. R. 24.)  Moreover, the Application stated that the

Site "complies with the parameters for the development of new towers" as provided by the Code.

(Pls.' 56.1 ¶ 15; Admin. R. 124.)  Specifically, Plaintiffs explained that the Facility "is located

on a very large[] and well vegetated property in the R-1 zone, that provides excellent distance

from residential homes," the location "should minimize the potential visual impacts on these

properties," the "foliage should . . . provide a natural cover that reduces the appearance of the

tower from many perspectives," and "[a]lthough the Site is located in relatively close proximity

to the [Taconic State Parkway], it will be setback a substantial distance from certain scenic areas

and ridge lines identified in the Code, including the intersection of Route I-84 and the Taconic

State Parkway, the Appalachian National Scenic Trail, Hosner Mountain, Stormville Mountain

and the Mountains of Wiccopee."  (Pls.' 56.1 ¶ 15; Admin. R. 124–25.)  Plaintiffs also submitted

a photograph of the Site to the Board.  (Pls.' 56.1 ¶ 16.)

As relevant to their request for a height variance, Plaintiffs submitted that the Facility—"designed at a height of one-hundred and fifty (150) feet, with Verizon's antennas located at a centerline height of one-hundred and forty-six (146) feet," (Admin. R. 25)—will "enable Verizon to provide the requisite service to its customers living in and traveling through the targeted area," (*Id.* at 26).  Moreover, Plaintiffs stated that "by designing the facility to accommodate the future collocation of up to five (5) additional wireless carriers, Homeland is complying with the intent of the Wireless Law by minimizing the potential need for future communication towers in this portion of the Town."  (*Id.*)  To support their assertions, Plaintiffs relied on the Initial RF Analysis.  (*Id.* at 27, 46–47.)

The Application also requested a wetland/watercourse disturbance permit based on the September 19, 2011 wetlands investigation of the Site conducted by Tectonic Engineering & Surveying Consultants, P.C. ("Tectonic"), which found that "certain federal and town regulated freshwater wetlands and an associated intermittent watercourse are located within and around the proposed project area."  (*Id.* at 28, 133.)

Attached to the Application, Plaintiffs submitted: (1) a deed demonstrating ownership of the underlying premises, (*id.* at 29, 38); (2) the Initial RF Analysis, which included several RF signal propagation maps and images depicting the Site, and copies of Verizon's FCC Licenses, (*id.* at 29, 43); (3) an Antenna Site FCC RF Compliance Assessment and Report prepared by Pinnacle Telecom Group, dated October 26, 2011, explaining that the radio frequency emissions associated with the proposed Facility will not exceed federal or state regulations (the "FCC RF Compliance Report"), (*id.* at 29, 71); (4) a Full Environmental Assessment Form ("EAF") and

Visual EAF Addendum, dated October 25, 2011, prepared by Tectonic, (*id.* at 29, 95); (5) a letter dated October 14, 2011 certifying that the proposed Tower will be designed and constructed in accordance with applicable standards, (*id.* at 29, 119); (6) the ASA, (*id.* at 29, 121); (7) a letter from Homeland dated October 27, 2011 confirming that Homeland will coordinate to rent or lease available space on the Monopole to other telecommunications providers in the future, under the terms of a fair market lease, (*id.* at 30, 128); (8) a letter from Homeland dated November 11, 2011 committing to, among other things, keep the proposed tower and accessory structures in good order and repair, (*id.* at 30, 131); (9) the Wetlands Investigation Report, prepared by Tectonic (*id.* at 30, 133); (10) a Federal Aviation Administration Determination of No Hazard to Air Navigation, dated October 31, 2011, (*id.* at 30, 184); and (11) an explanation of the TCA, (*id.* at 30, 188).

### 2.  The Coverage Gap

The Board retained its own wireless consultant, Ronald Graiff, P.E. ("Graiff" or the "Board's consultant") to review and advise the Board on RF issues related to the Application. (Pls.' 56.1 ¶ 17; Admin. R. 348, 1475.)  On April 10, 2012, Graiff submitted a letter and accompanying materials to the Board ("Graiff's Initial Report"), concluding that even though "Verizon has reasonably demonstrated that it has a gap in coverage in the general area of the Taconic State Parkway," it "has not demonstrated . . . that the [Site] is *unique* in its ability to provide coverage relief."  (Admin. R. 366(b).)  Accordingly, Graiff suggested to the Board that Plaintiffs provide additional information with respect to what alternative sites and means were available to provide the coverage, demonstrate that 150 feet above the ground is the minimum

height necessary, provide information about alternate means to "ameliorate the visual impact of the antennas," demonstrate how the lines required for seven carriers could be placed within the pole without external mounting, and provide a revised RF report.  (*Id.* at 366(b)–(c).)  In his Initial Report, Graiff also noted his concerns about "Pilot Pollution,"—a "condition . . . which is a direct result of cells located too closely together . . . [that] results in system interference, poor hand off and a loss of system capacity."  (*Id.* at 365.)  Specifically, he stated that "the proposed site only provides approximately 20% new coverage (un-duplicated) and nearly 80% overlap with existing coverage[,] . . . . [and] [s]uch excessive overlap is an inefficient use of the radio spectrum."  (*Id.*)

In response to Graiff's Initial Report, Plaintiffs submitted additional RF Analyses and responses to the Board, as well as additional drive test data and propagation maps depicting Verizon's actual coverage needs.  (Pls.' 56.1 ¶ 25; Admin. R. 408–37; 548–68; 1286–1330; 1337.)  In its final RF Analysis dated March 22, 2013, Verizon stated that its analyses and presentations "clearly demonstrate (through the use of scientific data and sophisticated propagation and coverage analysis tools) that a significant gap exists in the Verizon network along the Taconic State Parkway, Route 82, and the surrounding areas."  (Pls.' 56.1 ¶ 37; Admin. R. 1301.)  Verizon advised the Board that in addition to "expanding reliable service along the Taconic State Parkway and surrounding areas," the Site is required to bring 4G data and internet service to residences and businesses in the area, and allow customers to cancel landline service.  (Defs.' 56.1 ¶ 3; Admin R. 1300.)  Plaintiffs also submitted the New York State Department of Transportation "Traffic Data Viewer" that indicates the average volume that passes through the

gap, along the segments of the Taconic State Parkway and Route 82, is an estimated 35,000 travelers per day.  (Pls.' 56.1 ¶ 39; Admin. R. 1332).

In a letter dated April 3, 2013, Graiff concluded that the coverage models provided by Plaintiffs were "reasonable representations of real world coverage."  (Defs' Resp. ¶ 18; Admin. R. 1341.)  Moreover, Graiff stated that "[i]t is evident . . . that the gap is real and defined."  (Pls.' 56.1 ¶ 31; Admin. R. 1341.)  At a public hearing on April 9, 2013, Graiff testified that:

> [A]s I said in my 4th report to [the Board], knowing that you can rely on the propagation maps as being a very good demonstration of the coverage, [the Board] can believe what they say, therefore when they show you a coverage map from the site at 146ft which is what they've done and at lower, you can believe that that's a good representation of coverage that would come from this site.

(Pls.' 56.1 ¶ 19; Admin. R. 1411 (DVD 2:13:26–56).)[3]  According to the Minutes of the Board's April 9, 2013 meeting, Graiff also informed the Board that:

> [H]e offers no interpretation of the law of what a significant gap is.  Along Route 82, there is a significant gap.  There is nothing there.  What is significant?  If this was just 1/8 of a mile, just two pixels on this map of the Taconic Parkway and it was down in the red, a person can be through that in a zip . . . . The problem is that in addition to the road of gray which is around it, there are some reds around it.  The signal is already deteriorating there.  That was what he was trying to flesh out . . . from a review point of view. . . . It is up to the Board and lawyers to determine what is significant.  A person can drive through a gap if it is a small gap.  These are reasonably sized gaps.

(Admin. R. 1404–05.)

At a Board meeting on December 11, 2012, Plaintiffs advised the Board that the size of the coverage gap "is approximately 2 miles on the Taconic State Parkway and . . . 1.6 miles on Route 82."  (Pls.' 56.1 ¶ 31; Admin. R. 708 (DVD at 1:20:53).)  Graiff, in turn, confirmed the

---

[3] The DVD references refer to video recordings of the Board meetings.

gap at the same meeting.  (Pls.' 56.1 ¶ 32; Admin. R. 708 (DVD at 1:21:13).)  For the purposes

of the Motion, Defendants contend that it was determined that there were two gaps on the

Taconic State Parkway of 0.5 mile and 0.25 mile.  (Defs.' 56.1 Resp. ¶ 30.)  Although

Defendants cite Graiff's July 2, 2012 letter and statements at a July 10, 2012 meeting for

support, there is nothing in the letter or statements that indicates that these were the sizes of the

two gaps.  (*See* Admin. R. 519, 532.)

### 3.  The Antenna Height and Collocation

Plaintiffs have provided substantial information in support of their claim that the

coverage gap can only be resolved at the Site with the Antennas placed at 146 feet AGL.  (Pls.'

56.1 ¶¶ 42–43; Defs.' 56.1 Resp. ¶ 40; Admin. R. 408–09, 549–50, 1290, 1304–06, 1308.)[4]  The

Parties dispute what this fact means for future collocation on the proposed Tower and what

evidence, if any, was submitted to the Board about the likelihood that other wireless providers

would need to locate their antennas at no lower than 146 feet AGL because of excessive clutter

caused by topography in and around the Site.  (Pls.' 56.1 ¶ 45; Defs.' 56.1 Resp. ¶ 45; Reply

Decl. of Andrew P. Schriever in Supp. of Pls.' Mot. for Summ. Judgment, Ex. A, Pls.' Resp. to

Defs.' Resp. to Pls.' Statement of Facts ("Pls.' 56.1 Reply") ¶ 45 (Dkt. No. 28).)

---

[4] In their statement of facts, Defendants contend that Verizon advised the Board that even with the proposed Tower, another facility on Route 82 will be necessary as Verizon completes its transition to 4G service.  (Defs.' 56.1 ¶ 4.)  As Plaintiffs point out, however, this statement was made to support the need for the height of the Monopole and Antennas.  (Reply Decl. of Andrew P. Schriever in Supp. of Pls.' Mot. for Summ. Judgment, Ex. A, Pls.' Resp. to Defs.' Statement of Facts ("Pls.' 56.1 Resp.") ¶ 4 (Dkt. No. 28).)  In the March 22, 2013 report, a Verizon Engineer stated that "[r]educing the tower height below the proposed 150 foot level (antenna center line of 146 feet) reduces coverage . . . and increases the likelihood that a new facility may be needed in the NY-82 exists area in the future."  (Admin. R. 1290.)

Defendants contend that there is limited to no coverage below 146 feet "due to excessive clutter." (Defs.' 56.1 Resp. ¶ 40). To support this claim, Defendants rely on the Initial RF Analysis, which states that "[a] lower antenna center line would limit the coverage due to the terrain blockage and the surrounding foliage," (Defs.' 56.1 ¶ 7; Admin. R. 47), and at any distance below 146 feet, "clutter"—in the form of terrain, trees, and buildings—"weakens and disperses[] the RF energy necessary for wireless communications," (Defs.' 56.1 ¶ 8; Admin. R. 46). The Initial RF Analysis also states that:

> At a lower height, the RF energy would be significantly reduced from providing coverage to the north along the Taconic State Parkway and an inconsistent transition to the next site would remain. The area around the intersection of Route 82 and Taconic Pkwy would also be greatly impacted by a lower center line; not only would the foliage be a factor but the terrain would significantly weaken the RF signal.

(Defs.' 56.1 ¶ 9; Admin. R. 47.) Defendants state that "Graiff advised the [Board] that if Verizon needed to locate its antennas at 146 feet [AGL,] then it was likely that other wireless providers would need to locate their antennas at least [at] the same height, but not [at] a lesser height due to problems with excessive clutter," (Defs.' 56.1 Resp. ¶ 45), and point the Court to the Minutes from the Board meeting on April 9, 2013. Graiff made several statements as to collocation at the April 9, 2013 meeting, including that "in this hearing process there has been no evidence presented with respect to other carriers' coverage[,]" "[i]f it takes 146 feet for this carrier, it is going to probably take that for another carrier[,]" and "[a]ll the evidence was presented with respect to Verizon[,] so he could[] [not] give the Board an opinion on any other carrier." (Admin. R. 1405.)

11

Plaintiffs, in turn, point to Graiff's statement in a letter dated April 12, 2013 that "[t]here has been no evidence presented in this proceeding that either demonstrates or discusses the coverage of existing carriers such as AT&T or Sprint PCS.  That question can only be answered by another applicant should they come before [the] Board," (Pls.' 56.1 Reply ¶ 45; Admin. R. 1457), and Graiff's testimony at the Board's April 9, 2013 meeting that "[i]n this hearing process there's been no evidence presented with respect to other carriers' coverage," (Pls.' 56.1 Reply ¶ 45; Admin. R. 1405).  Plaintiffs also contend that they advised the Board that "Verizon cannot produce propagation plots for other carriers, nor can it make any representations that certain heights will or will not address other carriers' coverage needs," because "[e]ach carrier has a unique network, which may utilize different signal 'hand-off sites, locations[,] and heights." (Pls.' 56.1 ¶ 49; Admin. R. 1209.)  Plaintiffs point to other evidence in the record that supports the fact that they advised the Board that they could not opine on other carriers' needs.  (Pls.' 56.1 Reply ¶ 46; Admin. R. 412, 622, 1386–87.)

Defendants highlight, though, that the FCC RF Compliance Report submitted with the Application shows that other providers in East Fishkill use similar transmission frequencies as Verizon.  (Defs.' 56.1 ¶¶ 17–18; Admin. R. 79–80.)  Verizon established that locating the Antennas at 146 feet AGL was necessary to provide coverage for its transmission in the 700 MHz, 850 MHz, and 1900 MHz frequency bands.  (Admin. R. 75.)  AT&T uses identical frequency bands, (*id.* at 79), Sprint uses the 1900 MHz frequency band, (*id.*), and T-Mobile uses the 1900 MHz and 2100 MHz frequency bands, (*id.*).  The FCC RF Compliance Report also identifies the panel antennas commonly used by each provider within their respective frequency

band, (*id.* at 80), and for the purposes of the study assumes that the providers would be located as follows: Verizon at 146 feet, AT&T at 96 feet, Sprint at 136 feet, and T-Mobile at 106 feet, (*id.* at 79).  Defendants state, and Plaintiffs do not dispute, that there is no evidence in the record that these are feasible mounting positions for collocation of wireless transmissions.  (Defs.' 56.1 ¶ 26.)

Defendants also deny that Plaintiffs demonstrated that the Facility is designed to accommodate collocation of up to five additional commercial antenna installations, including municipal/emergency antennas, in the future.  (Pls.' 56.1 ¶ 46; Defs.' 56.1 Resp. ¶ 46.)  Instead, Defendants contend that Plaintiffs offered no evidence to support an inference that collocation was feasible, that a representative from Homeland, Mr. Giofree ("Giofree"), agreed, and that Homeland failed to document the Tower's capacity for collocation, including the number and types of antennas it could accommodate and potential mounting locations, in violation of the Code.  (Defs.' 56.1 Resp. ¶ 46; Defs.' 56.1 ¶ 13; Admin R. 1390–91.)[5]  Plaintiffs disagree.  First, they state that Giofree's statements were made in reference to visual analysis, not collocation. (Pls.' 56.1 Reply ¶ 46.)  At a meeting on April 9, 2013, Giofree stated that the Facility "clearly meets the objective" that "a new telecommunication tower facility allow, accept, and accommodate collocation in the future."  (*Id*; Admin. R. 1386.)  In his explanation, Giofree noted that "Homeland has also agreed to coordinate to rent or lease available space on the facility to other providers in the future, in the terms of a fair market lease."  (Pls.' 56.1 Reply ¶ 46; Admin.

---

[5]  Defendants also point to the fact that the planned 10x12x30 shelter for Verizon's equipment is intended solely for Verizon's use.  (Defs.' 56.1 ¶ 5; Admin. R. 304–05.)

R. 686.)  Second, Plaintiffs contend that drawings, a letter from a New York State licensed Professional Engineer, the FCC RF Compliance Assessment Report, and an affidavit from the president of Homeland demonstrate that the Facility is designed to accommodate the collocation of up to five additional commercial antennas.  (Pls.' 56.1 Reply ¶ 46; Admin. R. 119, 128–29, 443–44, 447–48, 601–02.)

### 4.  Alternative Site Options

Plaintiffs contend that Homeland investigated alternative siting options to remediate the known service gap approximately a decade before submitting the Application.  (Pls.' 56.1 ¶ 68.) Plaintiffs advised the Board that for a site to be a "viable alternative, the site must have a landlord who is willing to enter into a lease with a service provider."  (Pls.' 56.1 ¶ 75; Admin. R. 1203.)  In the ASA, supported by several RF Analyses that include propagation plots and topographic images prepared by Verizon's RF Engineers, Plaintiffs outlined their search to identify potential siting locations, including "alternate, existing structure candidates evaluated for shared use or collocation, as well as new tower sites."  (Pls.' 56.1 ¶¶ 76–77; Admin. R. 121–26, 410–12, 421–34, 548–49, 556–65, 1292–99, 1309–22.)  The ASA "contains an inventory of all existing tall structures and existing approved towers within a two mile radius of the proposed Site." (Admin. R. 122, 126.)  Plaintiffs investigated thirteen alternate single site options (i.e., involving only one new wireless facility), and two-multi-site alternatives (*i.e.* each involving two new facilities).  (Pls.' 56.1 ¶ 78; Admin. R. 122–26, 1202–05, 1292–99, 411–12, 548–49.)  The ASA and supporting documents identify, among other locations, properties that contain existing public utility infrastructure, as well as existing towers and tall structures in the area, for purposes

of evaluating whether they could be utilized for collocation purposes.  (Pls.' 56.1 ¶ 80; Admin.
R. 122–23, 409–10, 421–22, 548–49, 560–61, 570–71, 1292–99.)

Based on their search, Plaintiffs advised Defendants "that there are no available existing
tall structures or towers that meet Verizon's radio frequency needs for purposes of providing
reliable wireless coverage to the targeted area in the Town."  (Admin. R. 24.)  Plaintiffs
concluded that none of the single (new tower site) options identified in the ASA suffice, and
Graiff confirmed this finding in a July 2, 2012 letter.  (Pls.' 56.1 ¶¶ 90–91; Admin. R. 519.)  In
the same letter, Graiff noted that "[a] careful evaluation of all of the possible alternate sites does,
however, reveal an elegant 'two site solution' to provide the coverage relief sought," discussed in
further detail below.  (Admin. R. 519.)  During a July 10, 2012 meeting, "Graiff stated that he
found the [ASA] quite helpful.  It was an excellent job in showing every site that [Graiff] had
picked up and thought about, or the Board chose knowing the area better than [Graiff], that might
work as a possible alternative."  (*Id.* at 532.)

Plaintiffs also investigated public utility high power transmission structures located
approximately 3.5 miles west of the Taconic State Parkway, but in an RF Analysis, a Verizon
Wireless RF Design Engineer, Rick Andras ("Andras"), concluded that "[d]ue to distance and
the presence of . . . significant terrain features, there is no practical height along the[] power lines
from which a wireless facility could overcome the[] terrain impediments and provide service to
the Hillside Lake coverage objective area."  (Pls.' 56.1 ¶¶ 84–86; Admin. R. 1296.)

Moreover, from 2007 until February 2013, Homeland made efforts to locate the Facility
on non-residential and/or municipally controlled properties in the area, including the "Beekman

Water Company" property and the "Little Switzerland Water Tank" site.  (Pls.' 56.1 ¶¶ 111–12; Defs.' 56.1 Resp. ¶¶ 111–12; Admin. R. 123, 1156–57, 1162.)  In or around 2009, the Town rejected Little Switzerland Water Tank site as a possible option.  (Pls.' 56.1 Resp. ¶ 113; Admin. R. 12, 18, 1156–57, 1162–63.)  On August 11, 2011, Homeland participated in a pre-application submission conference with representatives from the Town.  (Pls.' 56.1 ¶ 114; Admin. R. 8.)  Subsequent to the pre-application conference, Town representatives recommended that Plaintiffs confirm the availability of the Beekman Water Company and Little Switzerland Water Tank sites.  (Pls.' 56.1 ¶ 116; Admin. R. 12, 18.)  After the conference, Plaintiffs inquired by letter dated September 16, 2011 whether "the status and/or availability of" two sites that were previously deemed unavailable by the Town for purposes of siting a new facility had changed.  (Pls.' 56.1 ¶ 5; Admin. R. 12.)  Plaintiffs sent a second letter dated September 30, 2011, reiterating their request and notifying the Town that they were preparing the documentation necessary to file the Application.  (Admin. R. 18.)

Throughout the application process, Plaintiffs suggested that the Little Switzerland Water Tank site may provide an alternative to the proposed Site.  (Pls.' 56.1 ¶¶ 119, 121–22, 124–25.)  Specifically, Plaintiffs explained that the Little Switzerland Water Tank site "might be a better location for this facility," given that "because of the increased elevation at that property which is adjacent to the current property we have a proposal on, the tower would only need to be 90 feet."  (Pls.' 56.1 ¶ 122; Admin. R. 1164 (DVD at 20:44–21:03).)  In response, the Board and Plaintiffs were advised by the neighbors that Little Switzerland Water Tank site "was not an option.  Nobody want[s] it. . . . [T]he applicant needed to hear that."  (Pls.' 56.1 ¶ 123; Admin. R. 1163.)

16

Defendants admit that Plaintiffs investigated the alternative sites and options, as discussed above.  Defendants contend, however, that Plaintiffs did not thoroughly investigate the two-site alternative proposed by Graiff.  (Defs.' 56.1 Resp. ¶ 76.)  The Board requested that Plaintiffs investigate two different two-site options.  (Pls.' 56.1 ¶ 95.)  The requested two-site options would require installing a new communications facility on an existing wood pole at 190 Old Sylvan Lake Road (the "Sylvan pole")—which Homeland does not own, and Verizon does not lease space on—in combination with also constructing either: (1) a new communications tower facility at 39 Loganberry Court, known as "Rand Water Company," or (2) a new communications tower facility at 1643 Route 82, known as "Anthony Associates," (*Id.* ¶ 96.)

The actual maximum available height and capacity on the Sylvan pole was determined to be lower than initially assumed.  (*Id.* ¶ 98; Admin. R. 549, 570, 1292.)  Plaintiffs submitted a certification from David Weinpahl ("Weinpahl"), an engineer at On Air Engineering, LLC, concluding that "additional co-location at the [Sylvan] pole is not possible due to structural and RF design concerns."  (Pls.' 56.1 ¶ 99; Admin. R. 1219.)  Plaintiffs also filed a second opinion from Antonio Gualtieri ("Gualtieri"), an engineer at Tectonic, certifying that "the existing wooden pole structure is not adequate to support the loads of the combination of the existing carriers and the proposed antenna installation by Verizon . . . at an elevation of 57' [AGL] . . . [and] these types of structures are not designed to be extendable."  (Admin. R. 1224.)

Plaintiffs evaluated both two-site options with increased antenna heights at each of the locations, including: (1) a 175 foot tower at Rand Water Company, or (2) a 175 foot tower at Anthony Associates.  (Pls.' 56.1 ¶ 105; Admin. R. 1294.)  Andras, Verizon's engineer,

concluded that, "[c]ollocation on the 80 foot wood [Sylvan] pole is not a viable part of a two-site scenario," because, among other things, "[a] coverage gap would remain along the Taconic State Parkway, and the surrounding areas in either hypothetical two-site scenario far beyond Verizon's -85dbm threshold." (Pls.' 56.1 ¶¶ 101, 106; Admin. R. 1296–97 (typeface altered).) Defendants admit that Andras concluded as much, but note that he did not state that there would be an absence of coverage at either the -85.1 to -87dBm or -87dBm to 89dBm ranges, and Graiff opined that the Verizon system "would work perfectly" in the -85.1 to -87dBm range and "might work" in the -87dBm to 89dBm range. (Defs.' 56.1 Resp. ¶ 106; Admin. R. 1341.) In its March 13, 2013 analysis, Verizon explained that "when operating the Verizon system beyond the -85 d[B]m threshold level, communication between the handset and base station becomes increasingly unreliable, and will likely experience call failures and significant performance degradation." (Admin. R. 1292.) Defendants fault Verizon for failing to provide any data regarding the signal strength produced by the two-site alternative in the target area, (Defs.' 56.1 ¶ 66 (second)),[6] but Plaintiffs point out that its March 13, 2013 analysis identifies the signal strength for the two-site analysis, (Pls's 56.1 Resp. ¶ 66 (second); Admin. R. 1294–95).

Verizon's revised RF analysis evaluating the two-site option did not quantify the remaining gap in service in the target area. (Admin. R. 534, 549, 571.) Graiff opined that the gap at Anthony Associates would be approximately 0.5 of a mile. (*Id.* at 609, 687.) In a June 2012 RF Analysis, Edwards stated that the remaining gap if the Rand Water Company site was used would be 0.6 of a mile. (*Id.* at 411.)

---

[6] In their 56.1 Statement, Defendants repeated paragraph 66. The citation above refers to

Based on their analyses, Verizon's RF Engineers ultimately concluded that "[c]ollocation on the [Sylvan] pole . . . is NOT a viable part of a two-site scenario (either from a structural integrity or coverage perspective)." (*Id.* at 1296.) Graiff, in turn, concluded that "[i]t is clear that . . . the coverage relief with the two site solution is not achieved." (Pls.' 56.1 ¶ 107; Admin. R. 1304.) Although Graiff stated that "[i]t would . . . appear that the existing monopole at [Sylvan] is not a viable alternate site for the two site solution," (Pls.' 56.1 ¶ 104; Admin. R. 1340), and that "[i]t appears that the two site solution with all of the alternates considered fails to meet the need to fill the gap," (Pls.' 56.1 ¶ 108; Admin R. 134), Defendants deny that the statement represents Graiff's final conclusion on the matter, (Defs.' 56.1 Resp. ¶¶ 104, 108). Instead, Defendants state that Graiff also concluded that a two-site alternative would be feasible if the Sylvan pole was re-engineered to be structurally sound and extended in height. (*Id.*; Admin. R. 1340.) Indeed, a Verizon RF Design Engineer agreed that the tower at Sylvan would have to be re-engineered to make the two-site alternative work. (Defs.' 56.1 Resp. ¶ 108; Admin. R. 1301.) Defendants point out that, despite these conclusions, Plaintiffs never proposed a re-engineering analysis. (Defs.' 56.1 Resp. ¶ 108.)

Plaintiffs also advised the Board that the Sylvan tower "has a greater impact on the surrounding neighborhood . . . . [as] [i]t is much closer to the proximity of the homes in the area[,] . . . . [and] the location provides no visual buffer to the surrounding neighborhood[,] which is relevant when compared to the [proposed Site]," and submitted an aerial image to the Board to support their statements. (Pls.' 56.1 ¶¶ 109–10; Admin. R. 1388, 1411 (DVD at

the second paragraph numbered as 66.

23:33).)  Defendants admit that the 80 foot pole at Sylvan was visible above the 70 foot trees.

(Defs.' 56.1 Resp. ¶ 110; Admin. R. 1220, 1293.)

### 5.  The Site's Effect on the Community

The Site, as described in some detail above, is more than 16 acres in size, abuts the

Taconic State Parkway, and is located in the R-1 Zoning District.  (Pls.' 56.1 ¶¶ 126–27; Admin.

R. 598.)  An estimated traffic volume of 28,000 people pass by the specific segment of the

Taconic State Parkway that abuts the Site each day, and an estimated traffic volume of 7,000

people per day travel along the specific segment of Route 82 that extends through the gap.  (Pls.'

56.1 ¶¶ 128–29; Admin. R. 1332.)  A public utility site with water tower infrastructure is located

immediately south of the Site.  (Pls.' 56.1 ¶ 130; Admin. R. 126, 1235.)  The Board was advised

"that there were recently four large ham radio towers in the neighborhood" near the Site, (Pls.'

56.1 ¶ 131; Admin. R. 1407), and at least one 130 foot ham tower was previously located on a

parcel at 21 Dartantra Drive, (Pls.' 56.1 ¶ 132; Admin. R. 700).  The parcel identified as 21

Dartantra Drive abuts the Site on its northern side, (Pls.' 56.1 ¶ 133; Admin. R. 598), and

neighbors opposing the Application confirmed that the ham towers existed on property along

Dartantra Drive at the time that they purchased their homes, (Pls.' 56.1 ¶ 134; Admin. R. 700–

02.)

The Facility is located on the central to northwestern portion of the Site, and setback over

500 feet from the nearest residential structure and over 800 feet from the nearest local road,

Dartantra Drive.  (Pls.' 56.1 ¶ 135; Admin. R. 598.)  The Site is well vegetated, and the Facility

is located in a heavily wooded area.  (Pls.' 56.1 ¶ 136; Admin. R. 1334).  The tree height is 65 to

75 feet, (Admin. R. 1157,1390), and the Tower, therefore, will extend up to 75 to 85 feet above the tree line, (Admin. R. 649).[7]

The Tower is planned to be a metallic structure with visible antenna arrays each measuring over six feet in diameter and a foot in height.  (Defs.' 56.1 ¶ 46.)  Defendants claim that Plaintiffs refused to consider a proposal to camouflage the Tower as an evergreen or flagpole, and, instead, insisted that it was purposefully designed as a metallic structure.  (Defs.' 56.1 Resp. ¶ 191; Defs.' 56.1 ¶ 45.)  Plaintiffs assert that the record contains no evidence that the Board even requested to review specific camouflaging for the Facility, (Pls.' 56.1 ¶ 191), and, indeed, the portions of the record that Defendants cite do not contain such information, (*see* Admin. R. 1340, 1396).

Plaintiffs submitted a Visual Resource Evaluation, dated January 30, 2012 (the "VRE") and supplemental Responses, dated June 20, 2012 and March 21, 2013, which were prepared and submitted to the Board by Plaintiffs' visual and environmental consultant, IVI Telecom Services, Inc. ("IVI").  (Pls.' 56.1 ¶ 137; Admin. R. 234–93, 493–96, 1230–40.)  Before submitting these documents, Plaintiffs requested to be placed on the October 11, 2011 Board meeting agenda to introduce the Facility to the Board, determine the vantage points that should be considered as part of the VRE, and set a schedule for a visual test in accordance with the Code.  (Pls.' 56.1 ¶ 138; R. 13.)  Defendants did not grant Plaintiffs' request.  (Pls.' 56.1 ¶ 140; Admin. R. 19–20.)

---

[7] Defendants state that "[t]he 150 foot Tower will extend up to 85–100 feet above the tree line," (Defs.' 56.1 ¶ 39), but the portions of the record that Defendants cite do not support this claim.  (*See* Admin. R. 649, 1389–90.)  Instead, the record supports that the "trees are approximately 70 feet."  (*Id.* at 1390.)

At a December 13, 2011 meeting, the Board authorized Plaintiffs to proceed with conducting a

viewshed analysis, including the requisite balloon test.[8]  (Pls.' 56.1 ¶ 144; Admin. R. 211.)

Plaintiffs contend that the Board did not request any specific vantage points or locations from

which it required photos to be taken, except from the viewpoint perspective of the Taconic State

Parkway, nor did the Board request that IVI employ any other methodology.  (Pls.' 56.1 ¶ 146;

Admin. R. 210–11).  Defendants deny this statement and point to § 194-79(B)(7) of the Code,

which identifies several scenic areas.  (Defs.' 56.1 Resp. ¶ 146.)

On January 7, 2012, IVI concluded its viewshed field investigation, including the

authorized balloon test, which was noticed by newspaper publication on December 29, 2011.

(Pls.' 56.1 ¶ 150; Admin. R. 222, 226.)  IVI informed the Board that "the balloon test and

photosimulations were completed in a worst case, 'leaf off' condition so that for much of the

year, any potential visibility will be even further minimized or removed."  (Pls.' 56.1 ¶ 152;

Admin. R. 494.)  At a February 15, 2012 meeting, a Homeland representative stated that "[t]here

is really no way of getting a perfectly accurate depiction during the balloon test of what it is

going to be like without cutting down trees."  (Admin. R. 305.)  The VRE notes that "IVI

additionally reviewed those resources listed in § 194-79(B)(7) of [the Code and] . . . . [a]ccording

to [its] review, all of the listed resources were confirmed to be well beyond the [area of potential

effect (the "APE")]."  (Pls.' 56.1 ¶ 154; Admin. R. 237.)  Plaintiffs contend that there is no

---

[8] According to the Code, a "viewshed analysis" is used "to determine the visual impacts
of the proposed . . . [Site]" and shall include, among other things, an "assessment of the
[T]ower's siting from significant vantage points and/or historic and scenic resources by balloon
testing or similar methodology."  (Code § 194-80(A)(12).)  A balloon test, in turn, "assist[s] in
determining areas from where a proposed tower may be visible."  (Admin. R. 496.)

evidence in the record that demonstrates or asserts that the Facility will be visible from or have any effect on resources listed in § 194-79(b)(7) of the Code.  (Pls.' 56.1 ¶ 156.)  Defendants disagree, pointing to the VRE's Figure 1, which notes that in fifteen photos, the balloons were visible, and Defendants conclude, instead, that there were multiple areas where the proposed Tower disrupts the scenic viewshed.  (Defs.' 56.1 Resp. ¶ 156; Defs.' 56.1 ¶¶ 41, 43; Admin. R. 238–40, 244.)

In the VRE, IVI concluded that the Facility "will NOT have an adverse effect on visual resources," and found that:

> [T]here will be minimal visibility of the [Facility] due to the variations in terrain, natural and man made obstructions[,] and significant tree cover.  At the small number of viewpoints where the [Facility] will be visible, either intervening tree cover will limit the aesthetic effect of the proposed [Facility] or the [Facility] will be at such a significant distance from the viewpoint so as to limit the visual impact.

(Pls.' 56.1 ¶ 159; Admin. R. 241.)  At a meeting on August 9, 2013, a representative from IVI explained that when "[t]he three balloons were floated at the location of the [T]ower . . . . [f]rom all . . . vantage points, I[V]I was able to find that none of them were actually visible[,] [and] [i]n all cases, they were partially visible[,] [which means] . . . . visible through the tree cover . . . . There is always a view through screening."  (Admin. R. 1390.)

Neighbors opposing the Site retained George M. Janes ("Janes") to review and challenge the VRE.  (Pls.' 56.1 ¶ 164; Admin. R. 690.)  At the Town meeting on December 11, 2012, Janes criticized the VRE on the grounds that the photograph quality of the locations was poor and not

in accordance with industry standards.  (Admin. R. 690–91.)[9]  He opined that the VRE "cannot

be used as an assessment of the project's impact" and advised that the Board "needs to demand

more."  (*Id.* at 691.)  On February 12, 2013, Janes presented two photographic simulations taken

from two locations: (1) private property, known as 23 Dartantra Drive, which is the proposed

Site; and (2) from 70 Old Sylvan Lake Road.  (Pls.' 56.1 ¶ 167; Admin. R. 1413–14.)

Matthew W. Allen ("Allen"), a representative from Saratoga Associates Landscape

Architects, Architects, Engineers, and Planners, P.C. ("Saratoga"), was retained to by IVI to

review the VRE and Jane's conclusions.  (Admin. R. 1243.)  Saratoga "has over 30 years [of]

experience in the specialized discipline of visual impact assessment for a variety of project types

including . . . communications infrastructure," (*id.* at 1243), and Janes acknowledged that Allen

is a "reasonably well-known professional in this field, (*id.* at 1415).  In a letter dated March 22,

2013, Allen stated that although four images from the VRE "are of lesser quality than standard

photographs[,] . . . [g]iven the totality of photographic information contained in the VRE," the

VRE can still be used to make a "determination of visual significance."  (*Id.* at 1243–44.)  Allen

also noted that "Janes's comments are limited to a critique of the quality and completeness of the

VRE[,]" and "while highly critical of the methodology of the IVI analysis, Janes provides no

independent analysis or evidence demonstrating that the VRE findings of 'no significant impact'

are incorrect."  (*Id.* at 1246.)  Allen concluded that:

> [T]he VRE prepared by IVI associates is accurate and of sufficient
> detail, . . . . [and] [b]ased on . . . review of this information, Janes['s] rebuttal, and
> our own site visit and 3-D analysis[,] it is clear that the project will be well

---

[9] The Board Minutes incorrectly record Janes's name as "George James."  (Admin. R. 690.)

> screened by intervening landform and vegetation for all sensitive visual resources
> resulting in no adverse visual impact.  Further, a substantial buffer of existing
> mature forest vegetation will remain between the proposed project and adjacent
> residences.  Although isolated views may occur above intervening trees, views
> from neighboring properties will be substantially screened by forest cover and
> understory vegetation during leafless winter months and fully screened during the
> summer months.

(*Id.* at 1246–47).  On April 9, 2013, Janes submitted a supporting letter and materials to the

Board.  (*Id.* at 1412–14.)  Allen also testified before the Board that, among other things, he had

"never seen an application with a less visual impact than this one."  (Pls.' 56.1 ¶ 173; Admin. R.

1411 (DVD at 54:34–40).)

59 trees would be cut down to allow for the construction of the Facility, of which

Plaintiffs claim only 7 are greater than 20 inches in diameter and "the rest are either saplings or

something a little bit more like that."  (Admin. R. 1389.)  Allen explained that creating

simulations illustrating the removal of vegetation in the area is "an extremely difficult and

imprecise task" and "[e]ven if you assume the photo simulations provided by Janes are accurate,

these visualizations demonstrate that visibility of ground level facilities is minimal and does not

represent a significant visual impact."  (*Id.* at 1245.)  Plaintiffs submitted a photo to the Board

during the April 9, 2013 public hearing to show the "actual footprint of the disturbance."  (*Id.* at

1389.)

Also relevant, neighbors of the Site testified that the Facility would negatively affect the

views from their residences.  (*Id.* at 701–06.)  However, the New York State Historic

Preservation Office ("SHPO") found that IVI followed proper procedures and concluded that

there will be "No Adverse Effect on Historic Properties in [the APE]" from the Facility, which

includes the Taconic State Parkway as "[t]he sole resource identified."  (Pls.' 56.1 ¶ 163; Admin.

R. 498, 500.)  The Board's planning consultant, Michelle Robbins ("Robbins") concluded that

"[d]ue to intervening distance and topography as well as existing vegetation, views of the tower

would be partially screened from most locations in the study area."  (Admin. R. 297.)

The Parties also dispute whether the Facility will negatively affect property values in the

surrounding area.  An affidavit submitted by Anthony V. Serino (the "Serino Affidavit")

concluded that property values decline approximately 20% in areas where a cell tower exists.

(*Id.* at 815.)  Serino based his affidavit on his experience as a Dutchess County realtor.  (Defs.'

56.1 Resp. ¶ 199; Admin. R. 815).  Based on this experience, Serino opined that "many people

are reluctant to purchase homes in neighborhoods where cell towers are located because there is

a perception among potential buyers that a health risk exists."  (Admin. R. 815 (typeface

altered).)

Plaintiffs submitted a report by Edward J. Ferrarone, a certified appraiser employed at

Lane Appraisals, Inc., Real Estate Valuation Consultants (the "Ferrarone Report").  (Pls's 56.1

¶ 202; Admin. R. 1260–84.)  Ferrarone explained that he reviewed the Application and that his

opinion was based on an "ongoing study of sales of homes within a close proximity of similar

facilities in Westchester, Putnam[,] and Rockland Counties."  (Admin. R. 1261.)  The Ferrarone

Report concluded that "the installation, presence and/or operation of the [Facility] will not result

in the diminution of property values or reduce the marketability of properties in the immediate

area."  (*Id.* at 1263.)

### 6.  Hearings

The Board conducted reviews and public hearings on the Application on November 13, 2012, December 11, 2012, February 12, 2013, March 12, 2013 April 9, 2013, and June 11, 2013. (*Id.* at 679, 1155, 1384, 1470, 1495.)  The Denial states that on April 9, 2013, . . . the [p]ublic [h]earing was closed, and the time for a Decision & Order was extended by mutual agreement to June 12, 2013." (*Id.* at 1495.)  Plaintiffs contend that the "Board closed the public hearing on April 9, 2013 and did not continue it to June 11, 2013, but rather reserved its decision to an uncertain date."  (Pls.' 56.1 Reply ¶ 221.)  Plaintiffs state that the Board did not inform them or the public at the April 9, 2013 public hearing, or directly any time thereafter that the special meeting would take place.  (Pls.' 56.1 ¶ 224.)  Defendants point out that the Board meeting, like all Town meetings, was posted on the Town website, as Plaintiffs had been previously notified. (Defs.' 56.1 Resp. ¶ 224.)  On April 29, 2013, the Board held a special meeting to discuss the Application, with an agenda stating that "the Board expects to go into executive session for the purpose of discussing this matter with [its] attorney."  (Admin. R. 1465.)  Accordingly, the Board opened the April 29, 2013 meeting and adopted a motion to "go into Executive Session with [its] Attorneys for the purpose of discussing" the Application.  (Pls.' 56.1 ¶ 225; Admin R. 1466.)

### 7.  The Board's Decision

On June 11, 2013, the Board issued a decision denying the Application (the "Denial"), which was reduced to a final written resolution on June 15, 2013.  (Pls.' 56.1 ¶¶ 20–21; Admin.

R. 1468, 1470, 1475, 1491–1517.)[10]  First, the Board concluded that there "is *not* a significant

gap because there is tremendous redundancy and overlap from the proposed Tower with existing

coverage." (Admin. R. 1477.)  Specifically, the Board relied on the conclusion in Graiff's Initial

Report that "the proposed site only provides approximately 20% new coverage (un-duplicated)

and nearly 80% overlaps with existing coverage . . . ." (Defs.' Resp. ¶ 29; Admin. R. 1476.)

Furthermore, the Board explained that "although numerous calculated and drive test propagation

plots of existing coverage were presented in support of its case, Verizon provided no actual call

or traffic data from its system demonstrating that its customers were suffering from a lack of

service or 'dropped calls' in the two distinct but very small purported gaps (estimated . . . to be

approximately one quarter mile and one half mile, which a driver on the Taconic Parkway would

pass through in approximately 20–35 seconds)." (Defs.' Resp. ¶ 29; Admin. R. 1477.)

Second, the Board concluded that "collocation, as presented by [Plaintiffs] throughout the

review and public hearing process, is *not* feasible due to topographic considerations." (Admin.

R. 1478.)  Specifically, the Board explained that documents Plaintiffs submitted show that "only

Verizon will achieve full coverage to the target area; other carriers will likely encounter

significant signal attenuation, and minimal or no coverage is achieved at heights below the 146'

cover line." (*Id.* (emphasis omitted).)  The Board based this explanation on Plaintiffs' admission

that "[a]t a lower center [than 146'] the Verizon Wireless signal would be impacted by additional

clutter," and reasoned "this could apply to carriers other than Verizon as well." (*Id.* (alteration in

original) (internal quotation marks omitted).)  Moreover, the Board noted that "[b]y building in

---

[10] The Court cites to the Denial contained in the Board's Minutes on June 11, 2013.

tower height expansion, the Applicant could increase the height of the tower without going through the rigorous requirements of the [Code] as it pertains to construction of a new tower, and the [Board] could be bound as a matter of Federal Law to approve any such increase under the recently enacted Middle Class Tax Relief and Job Creation Act of 2012." (*Id.* (emphasis omitted).)  In short, the Board explained, "coverage below the 146' center line of the proposed 150' tower is essentially useless, and a single carrier tower serving Verizon only is likely," and the Application "implies that additional variances could be sought which may increase the height of the tower," which "would have a substantial effect on the neighboring property owners." (*Id.*) Further, according to the Board, Plaintiffs did not "provide any information on minimal impact alternate technologies . . . that could provide the relief [Verizon] (as well as other carriers) might seek in filling this obvious very small gap in coverage." (*Id.* at 1479.)

Third, the Board concluded that "[b]ased upon a review of the various [s]ite [p]lans, actual photographs, and visual projections, the proposed tower and associated equipment compound will be *highly intrusive* to the communities affected." (*Id.*)  Specifically, the Board found that the Tower, "approximately [three] times the height of the tallest existing tree," will be seen from "numerous vantage points," "will not be disguised as a tree or flagpole" and, therefore, "will be an eyesore in mature, residential neighborhoods." (*Id.*)  Further, the Board found that numerous trees will be cut down, which will make the Facility even more visible, and the Facility will impact "the viewshed" of the Taconic State Parkway. (*Id.* at 1479–80.) Accordingly, because it concluded that the Facility is "not pleasing to the senses," the Board determined that the Facility fails to comply with § 194-80(a)(11)(b) of the Code, which requires

applicants to minimize visual impacts upon residential properties, and New York Environmental Conservation Law § 8-0103(1).  (*Id.* at 1480.)

Fourth, in analyzing the Facility's effect on property values, the Board relied on the Serino Affidavit, to conclude that "property values decline *approximately 20%* in areas where a cell tower exists."  (*Id.*)  The Board found the Ferrarone Report deficient because it did not rely on data concerning the effect of a cell tower on property values in rural Dutchess County, the bulk of the data provided was "relatively antiquated," no photographic evidence was provided, and the examples discussed were irrelevant.  (*Id.* at 1481.)

Finally, the Board concluded that a special permit was not warranted under the Code because the Facility did not meet every condition required by the Code.  (*Id.* at 1482.)

### B.  Procedural History

Plaintiffs filed the instant Complaint on July 10, 2013, alleging that Defendants violated Section 704 of the Telecommunications Act, 47 U.S.C. § 332(c)(7)(B)(i)(II), by effectively prohibiting Plaintiffs from fulfilling a need for wireless services to East Fishkill and the surrounding area, and Section 704 of the Telecommunications Act, 47 U.S.C. § 332(c)(7)(B)(iii), by failing to support its decision with substantial evidence in the record.  (Pls.' Compl. ¶¶ 180– 91 (Dkt. No. 1).)  Plaintiffs also claim that they are entitled to reversal of the Denial pursuant to Article 78 of the New York Civil Practice Laws and Rules (the "CPLR").  (*Id.* ¶¶ 192–98.)  After a conference on March 13, 2014, the Court set a briefing schedule.  (Dkt. No. 13.)  The Court heard oral argument on December 9, 2014.

30

## II.  DISCUSSION

### A.  Applicable Law

#### 1.  Standard of Review for Summary Judgment

Summary judgment shall be granted where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River, N.J. v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to

create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing that there is a genuine issue for trial," *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis and internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

 "On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod,* 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)); *see also*

32

*Schatzki v. Weiser Capital Mgmt., LLC*, No. 10-CV-4685, 2013 WL 6189465, at *14 (S.D.N.Y. Nov. 26, 2013) (same).

### 2.  The Telecommunications Act of 1996

The Telecommunications Act of 1996, codified in part at 47 U.S.C. § 332, is "an omnibus overhaul of the federal regulation of communications companies," enacted to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition." *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 637 (2d Cir. 1999).  To further this goal, Congress enacted 47 U.S.C. § 332(c)(7), which "preserve[s] the authority of state and local governments over zoning and land use, but impose[s] limitations on that authority."  *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 101 (2d Cir. 2010) (citing 47 U.S.C. § 332(c)(7)); *see also Willoth*, 176 F.3d at 637 (explaining that § 332(c)(7) "limits the state and local government's authority to deny construction of wireless telecommunications towers, *see* [47 U.S.C.] § 332(c)(7)(B)(i), and regulates how such decisions must be made, *see id.* §§ 332(c)(7)(B)(ii)–(iv)").

### a.  Effective Prohibition Provision

Under the TCA, local governments retain authority over "decisions regarding the placement, construction, and modification of personal wireless service facilities," 47 U.S.C. § 332(c)(7)(A), but may not, among other things, "prohibit or have the effect of prohibiting the provision of personal wireless services," *id.* § 332(c)(7)(B)(i)(II).  This Section is known as the effective prohibition provision, *see T-Mobile Northeast LLC v. Town of Ramapo*, 701 F. Supp.

33

2d 446, 463 (S.D.N.Y. 2009), and "precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land lines," *Willoth*, 176 F.3d at 643.

"Although the TCA does not specify a remedy for violations of [this] subsection . . . the majority of district courts that have heard these cases have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits." *T-Mobile Northeast LLC v. Inc. Vill. of E. Hills*, 779 F. Supp. 2d 256, 275 (E.D.N.Y. 2011) (second alteration in original) (internal quotation marks omitted); *see also Town of Ramapo*, 701 F. Supp. 2d at 463 ("[U]nder *Willoth*, a violation of the effective prohibition provision requires injunctive relief: an application proposing the least intrusive means for closing a significant coverage gap cannot be denied—or, put differently, it must be granted" (citation, alteration, and internal quotation marks omitted)).

### b.  Substantial Evidence Requirement and Relevant State and Local Law

The TCA also requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).  In general, "denials subject to the [Telecommunications Act] are reviewed . . . more closely than other types of zoning decisions to which federal courts generally accord great deference." *Willoth*, 176 F.3d at 637 (internal quotation marks omitted).  "Whether a decision is supported by substantial evidence must be determined according to the traditional standard used for judicial review of agency actions." *Id.* at 638 (internal quotation marks omitted).  "Substantial evidence requires evaluation of the entire record, including opposing

evidence, and requires a decision to be supported by less than a preponderance but more than a

scintilla of evidence." *Id.* (citation omitted).  In other words, substantial evidence "means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

(internal quotation marks omitted).  A court must view the record in its entirety, and "may

neither engage in [its] own fact-finding nor supplant the Town Board's reasonable

determinations." *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999).

      "When evaluating the evidence, local and state zoning laws govern the weight to be given

the evidence[,] . . . [and] the TCA does not affect or encroach upon the substantive standards to

be applied under established principles of state and local law." *Id.* (internal quotation marks

omitted).  Here, the applicable local law is the Code, which sets forth the requirements for

obtaining a special permit to construct a new telecommunications facility.  State law, in turn,

provides that wireless providers are public utilities for the purposes of zoning applications.  *See*

*id.* (citing *Cellular Tel. Co. v. Rosenberg*, 624 N.E.2d 990, 993 (N.Y. 1993)); *see also Omnipoint*

*Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 555 (S.D.N.Y. 2009) (same).

Accordingly, the applications of wireless providers are reviewed under the public necessity

standard, which provides that "[r]ather than granting a variance only on a showing of

'unnecessary hardship,' a local zoning board must consider whether the public utility has shown

a 'need for its facilities' and whether the needs of the broader public would be served by granting

the variance." *Town of Oyster Bay*, 166 F.3d at 494 (quoting *Consol. Edison Co. v. Hoffman*,

374 N.E.2d 105, 111 (N.Y. 1978)); *see also N.Y. SMSA Ltd. P'ship v. Vill. of Floral Park*, 812 F.

Supp. 2d 143, 154 (E.D.N.Y. 2011) (same).  "Under the *Consolidated Edison* public necessity

standard, a utility must show that (1) its new construction is a public necessity that it is required to render safe and adequate service; and (2) there are compelling reasons, economic or otherwise, which make it more feasible to build a new facility than to use alternative sources of power such as may be provided by other facilities." *Omnipoint Commc'ns., Inc. v. City of White Plains*, 430 F.3d 529, 535 (2d Cir. 2005) (internal quotation marks omitted); *see also Town of LaGrange*, 658 F. Supp. 2d at 556 (same).  "Further, 'where the intrusion or burden on the community is minimal, the showing required by the utility should be correspondingly reduced.'" *Town of LaGrange*, 658 F. Supp. 2d at 555 (quoting *Consolidated Edison*, 374 N.E.2d at 111)).  In the context of telecommunications facilities, the public necessity standard requires that "[a] telecommunications provider that is seeking a variance for a proposed facility need only establish [1] that there are gaps in service, [2] that the location of the proposed facility will remedy those gaps[,] and [3] that the facility represents a minimal intrusion on the community." *Vill. of Floral Park*, 812 F. Supp. 2d at 154 (quoting *Site Acquisitions, Inc. v. Town of New Scotland*, 770 N.Y.S.2d 157, 160 (N.Y. App. Div. 2003) (internal quotation marks omitted)); *cf. Town of LaGrange*, 658 F. Supp. 2d at 556 (explaining that to establish necessity in the context of telecommunications facilities, a wireless provider "must demonstrate that (1) there was a need for service; (2) its proposed installation was safe . . .; and (3) the proposed action was more feasible than other options").

"Whether the utility ha[s] made the requisite showing and whether the Board's negative decision is supportable by substantial evidence appear to be two sides of the same coin." *Town of LaGrange*, 658 F. Supp. 2d at 555 (citing *Nextel Partners, Inc. v. Town of Fort Ann*, 766

N.Y.S.2d 712, 718 (N.Y. App. Div. 2003)).  Indeed, one district court, in *Omnipoint Communications, Inc. v. Town of LaGrange*, has noted that it had "not yet found a case in which a court upheld the denial of a variance once the [public necessity] standard was met."  *Id.*  Other district courts have, in turn, cited *Town of LaGrange* for the proposition that "[i]f the public utility makes the required showing, which necessarily means the record is devoid of substantial evidence to support a denial, the variance must issue."  *Vill. of Floral Park*, 812 F. Supp. 2d at 154 (citing *Town of LaGrange*, 658 F. Supp. at 555); *see also SMSA Ltd. P'ship*, 2013 WL 4495183, at *11 (same).  District courts have also more generally noted, however, that the substantial evidence standard requires that if "the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed."  *N.Y. SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals*, No. 08-CV-4833, 2010 WL 3937277, at *4 (E.D.N.Y. Sept. 30, 2010); *see also Vill. of Floral Park*, 812 F. Supp. 2d at 554 (same).

### 3.  Article 78

Article 78 of the CPLR provides that a party is entitled to relief from a local zoning decision that is "arbitrary and capricious" or is not supported by substantial evidence.  N.Y. C.P.L.R. §§ 7803(3)–(4).  Although "Article 78 imposes its own requirement that local decisions be supported by substantial evidence[,] [t]he Article 78 test is essentially the same as that under the TCA."  *Town of Ramapo*, 701 F. Supp. 2d at 461 (internal quotation marks omitted); *see also Vill. of Floral Park*, 812 F. Supp. 2d at 167 (same).

37

B.  Analysis

Plaintiffs argue that the Denial constitutes an effective prohibition of personal wireless services, in violation of the TCA, and is not supported by substantial evidence, in violation of the TCA and state law.  (Pls.' Mem. of Law in Supp. of Their Mot. for Summ. Judgment ("Pls.' Mem.") 2–3 (Dkt. No. 23).)  The Court addresses each of these claims in turn.

1.  Effective Prohibition Claim

Plaintiffs claim that the Denial effectively prohibits the provision of personal wireless services.  (Pls.' Mem. 6.)  The Court agrees.

As mentioned above, the Second Circuit has held that the TCA's "ban on prohibiting personal wireless service precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines."  *Willoth*, 176 F.3d at 643.  Under the *Willoth* standard, therefore, a plaintiff will prevail on an effective prohibition claim "if it shows both that a significant gap exists in wireless coverage and that its proposed facility is the least intrusive means to close that gap."  *Town of Ramapo*, 701 F. Supp. 2d at 456 (internal quotation marks omitted).

a.  Significant Gap in Coverage

To establish the first prong of an effective prohibition claim, a plaintiff must establish that a significant gap in wireless coverage exists.  *Willoth* provides that "[w]here the holes in coverage are very limited in number or size (such as the interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots as the area covered by buildings increases) the lack of coverage will likely be *de minimis* so that denying applications to

construct towers necessary to fill these holes will not amount to a prohibition of service."

*Willoth*, 176 F.3d at 643–44.  The means to determine whether a gap is significant under the first

*Willoth* prong, however, is far from clear.  Indeed, "[t]here are no magic numbers or percentages

that constitute a significant gap[, and] neither the TCA, the FCC, nor the courts have established

the 'significant gap' threshold.  Hence, each case must be viewed on its own."  *Liberty Towers,*

*LLC v. Zoning Hearing Bd. of Falls Tp., Bucks Cnty., Pa.*, No. 10-CV-7149, 2011 WL 6091081,

at *8 (E.D. Pa. Dec. 6, 2011); *see also Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d

38, 48 (1st Cir. 2009) (explaining that a determination of whether there is a significant gap is

"fact-bound").

In determining whether a gap is significant, district courts have looked at the gap's

physical size, the number of customers affected by the gap, the location of the gap, and drop call

or failure rates.  *See City of Cranston*, 586 F.3d at 49 ("When relevant, courts assessing whether

a coverage gap is significant should consider, inter alia, the physical size of the gap, the area in

which there is a gap, the number of users the gap affects, and whether all of the carrier's users in

that area are similarly affected by the gaps.");  *Liberty Towers,* 2011 WL 6091081, at *8

("District courts examine a number of factors when determining whether a significant gap exists,

including call drop or failure rates and the number of people affected by the gap." (citation

omitted)); *Nextel Partners, Inc. v. Town of Amherst*, 251 F. Supp. 2d 1187, 1196 (W.D.N.Y.

2003) (concluding that "gaps [were] clearly substantial and [were] not limited to rural areas or

the interior of buildings in sparsely populated areas[,]" as the plaintiff "[sought] to fill existing

coverage holes near the intersection of [roads] along with providing coverage along [a road] and

providing at least in-vehicle coverage [on other highways] . . . [all of which were] well traveled and certainly d[id] not qualify as rural areas"); *Omnipoint Commc'ns. MB Operations, LLC v. Town of Lincoln*, 107 F. Supp. 2d 108, 119 (D. Mass. 2000) ("Whether a gap constitutes a significant gap depends not only upon its physical size, but also, and perhaps more significantly, upon the number of customers affected by that gap." (internal quotation marks omitted)). Moreover, courts have considered whether the purported gap affects a plaintiff's ability to provide outdoor, in-vehicle, and in-building coverage. *See T-Mobile, LLC v. Unified Gov. of Wyandotte Cnty./Kansas City Kan.*, 528 F. Supp. 2d 1128, 1168–69 (D. Kan. 2007), *aff'd in part*, 546 F.3d 1299 (10th Cir. 2008) (finding that "in-building coverage may appropriately be considered as part of the significant gap analysis" and considering outdoor and in-vehicle coverage as well to determine whether the plaintiffs established a significant gap in coverage); *Town of Amherst*, 251 F. Supp. 2d at 1196 (finding relevant that the gap was not limited to "the interior of buildings" and that the plaintiff was trying to provide "in-vehicle coverage" on roads and highways).  To make these determinations, courts have relied on RF reports, expert testimony, propagation maps, and field test data.  *See e.g.*, *Inc. Vill. of E. Hills*, 779 F. Supp. 2d at 270 (relying on affidavits prepared by one of the plaintiff's RF engineers, two propagation maps, test data, and testimony of the plaintiff's RF engineers to conclude that a gap in the area measuring "approximately 1.145 miles [by] 1.704 miles" was significant); *Town of Ramapo*, 701 F. Supp. 2d at 458 (relying on the plaintiff's RF analysis and corresponding maps of coverage submitted with its application, another RF analysis, technical studies that were uncontested by the defendant board, and testimony and an affidavit from the plaintiff's RF engineer to conclude

40

the plaintiff demonstrated a significant gap in coverage); *Omnipoint Commc'ns, Inc. v. Vill. of Tarrytown Planning Bd.*, 302 F. Supp. 2d 205, 218–19 (S.D.N.Y. 2004) (relying on the plaintiff's RF reports, expert testimony, propagation analysis, actual field test data, as well as the testimony of the defendants' consultants and statements of planning board members to conclude that the plaintiff established a significant gap in coverage).

At oral argument, Defendants conceded that despite the Denial's conclusion, they were not contesting the gap. (Hr'g Tr. 50–51 (Dec. 9, 2014 Hr'g).) This concession, alone, is sufficient to satisfy the first *Willoth* prong under the effective prohibition test. *See e.g.*, *New Cingular Wireless PCS, LLC v. Town of Fenton*, 843 F. Supp. 2d 236, 254 (N.D.N.Y. 2012) (noting that "[t]he defendants have conceded that [the plaintiff] had a substantial coverage gap," and therefore turning to the second prong under *Willoth*). Nevertheless, the Court considers the Denial's conclusion to the contrary, and finds that there is no issue of material fact as to whether Plaintiffs have established that there is a significant gap in coverage.

The Denial claims that Plaintiffs' "entire justification for the [S]ite was based on [Verizon's] 'corporate' standard of signal strength." (Admin. R. 1477.) The Board pointed to no evidence in the record, however, to support this conclusion. Rather, Plaintiffs' submissions, described in more detail above, include RF analyses, propagation maps, and drive test data that demonstrate that there is a significant gap in coverage in the target area. The Initial RF Analysis attached to the Application states that that there is a "lack of adequate and reliable coverage in the area around the intersection of the Taconic State Parkway and NY Route 82," and a propagation map shows the gap. (*Id.* at 46, 51.) Plaintiffs submitted additional RF Analyses to

the Board, which included other propagation maps and additional drive test data depicting the gap.  (Pls.' 56.1 ¶ 25; Admin. R. 408–37; 548–68; 1286–1330; 1337.)  The Board did not contest these depictions or representations during the Town's proceedings and Defendants do not contest them here.  *See Town of LaGrange*, 658 F. Supp. 2d at 559 (finding it relevant that "[a]t no time during the underlying proceedings did the [defendant town] contest the depicted gap in coverage").  Indeed, Graiff, the Board's expert, advised the Board that the models provided by Plaintiffs were "reasonable representations of real world coverage."  (Defs' Resp. ¶ 18; Admin. R. 1341.)

Defendants do not deny that a gap in coverage along the targeted area exists.  (Defs.' Mem. of Law in Opp. to Pls.' Mot. for Summ. Judgment ("Defs.' Mem.") 7 n.1 (Dkt. No. 27).) Instead, to the extent that Defendants oppose Plaintiffs' claim under the effective prohibition provision, Defendants seem to contend that the gap Plaintiffs identify is not significant.  (*Id;* Admin. R. 1475–77.)  Plaintiffs' evidence, corroborated by Graiff's testimony and reports, however, establishes otherwise, based on the gap's size, the location of the gap, and the number of travelers the gap affects daily.  Plaintiffs advised the Board that the size of the coverage gap "is approximately 2 miles on the Taconic State Parkway and . . . 1.6 miles on Route 82."  (Pls.' 56.1 ¶ 31; Admin. R. 708 (DVD at 1:20:53).)  Although the Board stated in the Denial that Plaintiffs identified "two distinct but very small purported gaps (estimated by the Applicant's data to be approximately one quarter mile and one half mile, which a driver on the Taconic Parkway would pass through in approximately 20–35 seconds)," there is nothing in the record to

support this finding.  (Admin. R. 1477.)  Defendants point the Court to the Minutes of the

Town's April 9, 2013 meeting, which provide:

> Chairwoman Drummond asked based on their scale below there are two gray
> tracts along the Taconic Parkway.  In *her* estimation what appears to be more than
> one half of a mile and one looks to be a quarter of a mile.  If a person going 55
> miles an hour on the Taconic, that person will be doing a mile in a minute.  Then
> they are talking about 15 seconds to 35 seconds.  Mr. Graiff says that he offers no
> interpretation of the law of what a significant gap is.  Along Route 82, there is a
> significant gap. . . . If this was just 1/8 of a mile, just two pixels on this map . . . a
> person can be through that in a zip . . . A person can drive through a gap if it is a
> small gap. These are reasonably sized gaps.

(*Id.* at 1404–05 (emphasis added).)  It is clear from the Minutes, however, that the Chairwoman

of the Board was merely estimating the gaps from her perspective to question Graiff, who in turn

suggested that the gaps were reasonably sized.  Defendants also point to Graiff's July 2, 2012

letter, but the letter does not discuss or otherwise mention the size of the gap.  (*See id.* at 519.)

Rather, Graiff ultimately confirmed that the gap was approximately 2 miles on the Taconic State

Parkway and 1.6 miles on Route 82.  (*Id.* at 708 (DVD at 1:21:03–13).)  *See Town of Ramapo*,

701 F. Supp. 2d at 458–59 (holding that the plaintiffs demonstrated that a significant gap in

coverage existed and noting that "[t]he Town's own planning consultant even agreed that [the

defendant town] had known gaps in wireless coverage").  There is no issue of material fact, then,

as to the size of the coverage gap, as Defendants point to nothing in the record that would lead a

fact finder to reasonably conclude the coverage gap is a different size than Plaintiffs and the

Board's expert stated.  Moreover, although the size of the gap is by no means determinative, *see*

*Liberty Towers, LLC*, 2011 WL 6091081, at *8 (noting that "[t]here are no magic numbers or

percentages that constitute a significant gap"), the Court notes that courts have concluded that

smaller or similarly sized gaps in coverage have qualified as "significant" under the TCA, *see, e.g.*, *Vill. of Floral Park*, 812 F. Supp. 2d at 149 (holding gap measuring "approximately 1.2. miles north to south . . . and approximately .6 miles east to west" was significant); *Inc. Vill. of E. Hills*, 779 F. Supp. 2d at 270 (concluding that a gap in an area measuring "approximately 1.145 miles [by] 1.704 miles" was significant").

    In addition to its size, the gap affects the in-vehicle coverage of approximately 35,000 commuters on Taconic State Parkway and Route 82.  (Pls.' 56.1 ¶ 39; Admin. R. 1332). Tellingly, Defendants do not dispute the information Plaintiffs presented to demonstrate the effects of the gap on commuters in the area.  (Pls.' Reply Mem. of Law in Supp. of Their Mot. for Summ. Judgment ("Pls.'s Reply") 8–9 (Dkt No. 29).)  Accordingly, this is not a case where the gap in coverage is limited to the "interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots."  *Willoth*, 176 F.3d at 643–44.  Instead, the gap in coverage affects wireless services on a busy commuter route, which supports that the gap is significant for the purposes of the effective prohibition provision.  *See Town of Amherst*, 251 F. Supp. 2d at 1196 (finding relevant that the gap was not limited to "the interior of buildings" and that the plaintiff was trying to provide "in vehicle coverage" on roads and highways); *Town of Lincoln*, 107 F. Supp. 2d at 119 (explaining that a determination of whether a gap is significant under the TCA, "depends not only upon [the gap's] physical size, but also, and perhaps more significantly, upon the number of customers affected by that gap," and concluding that "[s]ince wireless services . . . are used while in transit, a gap that straddles a heavily traveled commuter thoroughfare would be more significant than a gap that affects a small residential cul-de-sac").

In light of the evidence of the gap's size, its location, and the number of people it affects—

evidence confirmed by the Board's expert or otherwise uncontested by the Defendants—the

Court concludes that Plaintiffs have established that a significant gap exists to satisfy the first

prong under *Willoth*.

<u>b.  Least Intrusive Means</u>

Under the second prong of the *Willoth* test, a local government may deny an applicant's

proposal if an applicant may "select a less sensitive site, . . . reduce the tower height, . . . use a

preexisting structure or . . . camouflage the tower and/or antennae."  *Willoth*, 176 F.3d at 643

(citations omitted); *see also Town of Ramapo*, 701 F. Supp. 2d at 456–57 (same).  As an initial

matter, there is no dispute that the Facility could not be less intrusive by diminishing the height

of the Tower, as the Parties agree that the coverage gap can only be resolved at the Site with the

Antennas placed at 146 feet AGL.  (Pls.' 56.1 ¶¶ 42–43; Defs.' 56.1 Resp. ¶ 40; Admin. R. 408–

09, 549–50, 1290, 1304–06.)  Moreover, although Defendants contend that "Plaintiffs refused to

consider a proposal to camouflage the Tower as an evergreen or a flagpole and, instead, insisted

that it was purposefully designed as a metallic structure," (Defs.' Mem. 15), Defendants fail to

identify "specific facts showing that there is a genuine issue" as to whether Plaintiffs refused to

consider such a proposal, *Wrobel*, 692 F.3d at 30 (emphasis and internal quotation marks

omitted).  Instead, the portions of the record that Defendants point to do not support their claim,

(*see* Admin. R. 1340, 1396), and Defendants conceded at oral argument that there was nothing in

the record to indicate that the Board ever made such a request.  (Hr'g Tr. 57.)  The Court also

notes that the Code does not mandate camouflage in the form as an evergreen or flagpole, but

45

rather requires that "[t]owers shall be painted with a flat paint in a gray or blue shade, except in instances where a different color is mandated by federal or state authorities."  (Code § 194-84(A)(2).)

Accordingly, the central issue here is whether the record demonstrates that there are no alternative sites or preexisting structures that could support a facility to remedy the significant gap that Plaintiffs identify.  As discussed in detail above, Plaintiffs investigated fifteen alternative siting options, including thirteen alternate single site options (i.e., involving only one new wireless facility) and two multi-site alternatives (i.e., each involving two new facilities). (Pls.' 56.1 ¶ 78; Admin. R. 122–26, 411–12, 548–49, 1202–05, 1292–99.)  Based on their search for a single site solution that would remedy the existing gap in service, Plaintiffs concluded "that there are no available existing tall structures or towers that meet Verizon's radio frequency needs for purposes of providing reliable wireless coverage to the targeted area in the Town," (Pls.' 56.1 ¶ 94; Admin. R. 24, 1202–05, 1301), and Graiff confirmed this conclusion, (Admin. R. 519).

Plaintiffs also investigated public utility high power transmission structures located approximately 3.5 miles west of the Taconic State Parkway, but Verizon's Engineers concluded that "[d]ue to distance and the presence of . . . significant terrain features, there is no practical height along these power lines from which a wireless facility could overcome the[] terrain impediments and provide service to the Hillside Lake coverage objective area."  (Pls.' 56.1 ¶¶ 84–86; Admin. R. 1296.)  Moreover, as detailed above, Plaintiffs were unsuccessful in their efforts to locate the Facility on non-residential and/or municipally controlled properties like the

46

"Beekman Water Company" property and the "Little Switzerland Water Tank" site.  (Pls.' 56.1 ¶¶ 111–12; Admin. R. 123, 1156–57, 1162.)

Defendants do not dispute that Plaintiffs investigated these alternative sites and options.  Rather, Defendants argue that Plaintiffs did not thoroughly investigate the two-site alternatives proposed by Graiff.  (Defs.' 56.1 Resp. ¶ 76.)  The Board did not, however, include this reason in the Denial to support its rejection of the Application.  The Supreme Court has recently held that the reasons that a board gives for denying an application need not "appear in the same writing that conveys the locality's denial of an application."  *T-Mobile South, LLC v. City of Roswell, Ga.*, 135 S. Ct. 808, 815 (2015).  Nevertheless, the TCA "requires localities to provide reasons when they deny cell phone tower citing applications," and, accordingly, "[a] locality may satisfy its statutory obligations if it states its reasons with sufficient clarity in some other written record issued essentially contemporaneously with the denial."  *Id.* at 818.  Here, not only did the Board fail to include this reason in the Denial, but there is nothing in the record that "states [this] reason[,]" let alone "with sufficient clarity."  *Id.*  Accordingly, it is at the very least questionable that the Court may consider this reason for denying the Application here.  *Cf. MetroPCS N.Y., LLC v. City of Mount Vernon*, 739 F. Supp. 2d 409, 423–24 (S.D.N.Y. 2010) (rejecting the defendant town's concern about the safety of the proposed wireless facility because "it was not raised during the application process and appears to be a *post hoc* rationalization for denying the application").

Assuming, arguendo, it is proper to consider this justification, the Court concludes that Defendants' claim regarding Plaintiffs' purported failure to investigate the two-site alternatives

is undermined by the record.  Plaintiffs submitted two reports from professional engineers who analyzed the Sylvan pole, which is a central component of either two-site option.  (Admin. R. 1219, 1224.)  Plaintiffs also submitted two RF analyses to the Board evaluating both two-site options, and additional information in a March 2013 submission.  (Pls.' 56.1 ¶ 102; Admin. R. 548–49, 556–65, 1292–96, 1301, 1310–30, 1339.)  Despite these reports, the Parties dispute whether Plaintiffs adequately investigated the proposed two-site alternatives.  The dispute centers on (1) whether at the current height of the Sylvan pole, the gap could have feasibly been remedied, or (2) whether the Sylvan pole could be re-engineered or otherwise extended to support Verizon's antennas.

First, Defendants complain that although Verizon's engineers conducted a revised RF analysis using the two sites that Graiff proposed in conjunction with the Sylvan pole at its current height, they did not quantify the remaining gap in the service area or offer data regarding the signal strength that would be provided by the two-site alternatives in the target area.  (Defs.' Mem. 18.)  Indeed, although the RF Analysis dated March 22, 2013 concludes that "[a] coverage gap would remain along the Taconic State Parkway, and the surrounding areas in either hypothetical two-site scenario, far beyond Verizon's -85 dBm threshold," (Admin. R. 1297), and provides maps with explanations to depict the remaining gap if the alternative sites were used, (*id.* at 1294–95, 1310–30), it does not quantify the gap.  Graiff, however, offered that a "relatively small gap of -85dBM coverage (approximately [0.5] mile) when the [Sylvan site] is considered with the use of either the site . . . at Anthony Associates or Rand Water" would remain.  (*Id.* at 609; 1339.)  Moreover, in an RF Analysis in 2012, Edwards concluded that there

48

would be a gap of 0.6 of a mile at the Rand Water Company site if the two-site solution was implemented there.  (*Id.* at 411.)  The size of the remaining gap at an alternate site is relevant, and at least one court has found that the fact that an alternative site leaves a small gap in coverage does not "unequivocally establish that [the] proposed monopole is the least intrusive means or even the only feasible plan."  *Site Tech Grp. Ltd. v. Bd. of Zoning Appeals of Town of Brookhaven*, 140 F. Supp. 2d 255, 264–65 (E.D.N.Y. 2001) (explaining that because "the TCA does not require 100% coverage[,]" the plaintiff's evidence suggesting "only that the use of existing . . . facilities would result in 'a small gap' and require more than one antenna" did not establish that the proposed site was the least intrusive means to fulfill the coverage gap). Accordingly, if this issue were dispositive as to whether the Site is the least intrusive means to remedy the gap in coverage, there may be an issue of fact that would preclude the Court from granting Plaintiffs' Motion.

Nevertheless, the question of whether use of the Sylvan pole at its current height could serve as a viable alternative from a coverage perspective is rendered immaterial by Plaintiffs' unrefuted evidence that establishes that the Sylvan pole could not structurally support Verizon's antennas without being redesigned or extended.  Weinpahl, the professional engineer, submitted a letter dated February 26, 2013 concluding that collocation on the Sylvan pole was not possible "due to structural and RF design concerns."  (Admin. R. 1219.)  Specifically, the pole was not designed to accommodate more than 6 antennas per carrier.  (*Id.*)  A second engineering report prepared by Tectonic confirmed that the Sylvan pole could not support Verizon's standard installation of 12 towers and that "given the limited structural capacity of the existing wood pole

49

and limited ground space, th[e] facility is not ideal for co-location capabilities." (*Id.* at 1224–25.)  Therefore, without extending or re-engineering the Sylvan pole, collocation would be impossible and the size of the gap left if the Sylvan pole were not extended is immaterial.

The issue, then, becomes whether Plaintiffs failed to investigate if the Sylvan pole could have been re-engineered or extended.  In a letter dated April 3, 2013, Graiff noted that "[i]f somehow, this site could be extended or rebuilt with a higher structure, the two site solution would, indeed, work," (Admin. R. 1340), a possibility that a Verizon RF Engineer also acknowledged, (Defs.' 56.1 Resp. ¶ 108; Admin. R. 1301).  During the Application process, however, Plaintiffs "reminded the [Board] that the unavailability of [the Sylvan site] as a viable option was a problem of its own making, as the [Board] issued a [s]pecial [p]ermit for an 80 foot pole there (conditioned on the pole not being expanded) when the original application was for a 150 foot structure."  (Pls.' Mem. 16 n.9; Admin. R. 3, 5, 1388.)  Accordingly, even though both Graiff and Verizon engineers agreed that extension or re-engineering of the Sylvan pole could remedy the gap, the option was foreclosed by the Board's previous zoning decision.  *See Town of Amherst*, 251 F. Supp. 2d at 1196 (explaining that the town's "adoption of a moratorium on any new towers has foreclosed" the only available alternative option, and concluding that "[t]he moratorium, coupled with the [Board's] denial of [the plaintiff's] application, . . . left [the plaintiff] with no means of filling the significant coverage gap").

There is no evidence, moreover, that the Board proposed to lift its condition, or otherwise asked Plaintiffs to reconsider the Sylvan pole without these limitations.  Nor is it likely that the Board would have made such suggestions.  The Sylvan pole is in close proximity to twelve

residences.  (Admin. R. 1411 (DVD 23:57–24:13).)  Indeed, Plaintiffs advised the Board that the

Sylvan tower "has a greater impact on the surrounding neighborhood . . . . [as] [i]t is much closer

to the proximity of the homes in the area[,] . . . . [and] the location provides no visual buffer to

the surrounding neighborhood," and submitted an aerial image to the Board to support their

statements.  (Pls.' 56.1 ¶¶ 108–09; Admin. R. 1388.)  Accordingly, although Graiff opined on the

viability of the Sylvan site if "somehow" it "could be extended," any additional efforts to further

investigate the Sylvan pole would have been futile in light of the Board's previous zoning

decision and the pole's location.  (Admin. R. 1340.)  *Cf. Town of Brookhaven*, 140 F. Supp. at

264–65 (concluding that the plaintiffs did not show "that reasonable efforts [to investigate

alternative sites] would be futile," because members of the town "offered to help plaintiffs locate

another suitable site[,]" and the town's fire district "offered the use of its property for locating a

monopole[,]" and therefore, "plaintiffs [could not] assert these efforts would be futile, as it

appears that plaintiffs [had] not even pursued them").

    In sum, the record demonstrates that Plaintiffs satisfied their obligation to make an effort

to evaluate alternative locations, *see SMSA Ltd. P'ship*, 2013 WL 4495183, at *18 (noting that

"[t]he law only requires a plaintiff to engage in a good faith effort to evaluate alternative sites"

and that such requirement was met when the plaintiff submitted reports that discussed eight

alternative locations); *Town of Fenton*, 843 F. Supp. 2d at 254 (finding the plaintiff met its

burden to establish that its proposed facility was the least intrusive means to remedy its gap in

coverage because the plaintiff "analyzed, in great detail, every attempt by the [board] and town

residents to identify a less intrusive, but still feasible, alternative"), but no alternative locations

existed, *see Town of LaGrange*, 658 F. Supp. 2d at 560 (concluding the plaintiffs established the second prong of the *Willoth* test because "the [Board's] denial of [the plaintiff's] application has left [the plaintiff] with no feasible means of filing the gap").  Plaintiffs, therefore, have established that the Facility is the "least intrusive means" to remedy the significant gap in coverage, entitling them to summary judgment on their effective prohibition claim.

### 2.  Substantial Evidence Claim

As discussed above, in evaluating a substantial evidence claim under the TCA, courts look to the applicable substantive standards under state and local law.  *See Town of Oyster Bay*, 166 F.3d at 494.  Here, the Court looks to the Code, which governs the Town's requirements that an applicant must meet to receive a special permit for construction of a new communications facility, and New York Law, which provides the requirements a public wireless service provider, like Verizon, must meet to establish the need for a variance.  *See Vill. of Floral Park*, 812 F. Supp. 2d at 154 (describing these requirements); *Town of LaGrange*, 658 F. Supp. 2d at 555 (same).[11]  The Court concludes that the reasons for the Board's denial—that (1) there was no significant gap; (2) the Facility poses a "significant danger . . . for a single carrier tower;" (3) the Facility will cause aesthetic harm; and (4) the Facility will cause a decrease in property values— are not supported by substantial evidence under these substantive standards.

---

[11] Defendants note that Homeland is not a "carrier."  Its co-applicant, Verizon, however, qualifies as a wireless service provider under New York law.  *See Town of LaGrange*, 658 F. Supp. 2d at 555 ("Under New York law, cellular telephone companies . . . are classified as public utilities for purposes of zoning applications." (internal quotation marks omitted)).  Defendants

a.  Gap in Service

The Code requires that before issuing a special permit to construct a new tower, the Board must find that "the applicant has shown an actual need for construction of the new tower." (Code § 194-82(c).)  The Board denied the Application, in part, because it found there is no significant gap in coverage.  (Admin. R. 1475.)  The three reasons offered by the Board to support its conclusion that there is not a significant gap in coverage, and, therefore, presumably that Plaintiffs did not demonstrate actual need as required by the Code, are not supported by substantial evidence.

First, the Denial claims that Plaintiffs' "entire justification for the [S]ite was based on [Verizon's] corporate standard of signal strength."  (*Id.* at 1477.)  Plaintiffs presented information, though, to show the gap's size, its location, and the number of people that it affects, as discussed above.  Although the Board was not "'bound to accept [Verizon's] expert testimony simply because . . . it was insufficiently contested by properly credentialed expert testimony,'" *Vill. of Floral Park*, 812 F. Supp. 2d at 160 (alterations in original) (quoting *City of White Plains*, 430 F.3d at 533), Defendants point to nothing in the record that supports their summary conclusion that the gap was based on Verizon's corporate standard.  Indeed, the Board was entitled to question Verizon's "experts credentials or the methodology used by the experts in arriving at their opinions," but it did not.  *Id.*; *see also Omnipoint Commc'ns, Inc.*, 430 F.3d at 533 (acknowledging that "the Board was free to discount [the plaintiff's] study because it was conducted in a defective manner").  Moreover, "[t]o refute the expert testimony, the Board could

conceded at oral argument that Homeland's status does not alter the standard of review applied

have presented its own expert testimony or evidence." *Vill. of Floral Park*, 812 F. Supp. 2d at

161.  The Board's expert, Graiff, however, ultimately agreed that a gap existed, (Pls.' 56.1 ¶ 32;

Admin. R. 708 (DVD at 1:21:13), 1341) and that the models provided by Plaintiffs were

"reasonable representations of real world coverage," (Defs.' Resp. ¶ 18; Admin. R. 1341.)  *See*

*Town of Ramapo*, 701 F. Supp. 2d at 458–59 (holding that the plaintiffs demonstrated that a

significant gap in coverage existed and noted that "[t]he Town's own planning consultant even

agreed that [the defendant town] had known gaps in wireless coverage" (internal quotation marks

omitted)).

Second, the Board declined to find a significant gap in coverage because "although

numerous calculated and drive test propagation plots of existing coverage were presented in

support of its case, Verizon provided no actual call or traffic data from its system demonstrating

that its customers were suffering from a lack of service or 'dropped calls' in the two distinct but

very small purported gaps (estimated by the Applicant's data to be approximately one quarter

mile and one half mile, which a driver on the Taconic Parkway would pass through in

approximately 20–35 seconds) in coverage along the Taconic Parkway."  (Admin. R. 1477.)  As

already discussed, there is nothing in the record to support a conclusion that the gap is

approximately one quarter mile and one half mile.  Moreover, nothing in the Code or the TCA

requires that Plaintiffs present data on dropped calls or customer dissatisfaction, and,

accordingly, it is not, without more, an adequate basis on which to deny the Application.  *See*

*Vill. of Floral Park*, 812 F. Supp. 2d at 161 (noting that "the fact that [the plaintiff] did not

---

to the Denial.  (Hr'g Tr. 37.)

present statistical data on dropped or missed calls . . . was not a valid basis for denying the [a]pplication," because "[t]here being no affirmative obligation [under the defendant town's code] to submit statistical evidence of dropped or missed calls, the absence of such data [could not] in and of itself impeach the credibility of Verizon's experts"); *MetroPCS N.Y., LLC v. Vill. of East Hills*, 764 F. Supp. 2d 441, 454 (E.D.N.Y. 2011) ("The failure of [the plaintiff] to introduce its customers' testimony of poor . . . coverage in the area, in and of itself, is not fatal to the application given the evidence of a gap that [the plaintiff] provided."); *cf. Verizon Wireless (VAW) LLC v. Douglas Cnty., Kan. Bd. of Cnty. Comm'rs*, 544 F. Supp. 2d 1218, 1245 (D. Kan. 2008) (holding that a denial is not supported by substantial evidence if it "imposes a burden upon [the plaintiff] to prove facts for which there is no requirement under state or local law").

Third, in the Denial, the Board concluded that there is no "significant gap because there is tremendous redundancy and overlap from the proposed Tower with existing coverage." (Admin. R. 1477.)  For support, the Board relied on Graiff's Initial Report, in which he stated that "the proposed site only provides approximately 20% new coverage (un-duplicated) and nearly 80% overlap with existing coverage[,] . . . . [and] [s]uch excessive overlap is an inefficient use of the radio spectrum."  (*Id.* at 365.)  A review of the report reveals, however, that this statement was made in regard to "Pilot Pollution," a "condition . . . which is a direct result of cells located too closely together . . . . [that] results in system interference, poor hand off and a loss of system capacity," and not whether a gap in service existed.  (*Id.*)  Defendants point to nothing in Graiff's Initial Report and his subsequent submissions and testimony that link the issue of pilot pollution to the issue of a gap in coverage.  In his Initial Report, Graiff concluded

55

that a gap in coverage existed.  Moreover, Plaintiffs contend that the issue concerning pilot

pollution was resolved as of December 11, 2012.  (Pls.' Mem. 8–9.)  Indeed, in the December 11,

2012 Minutes of the Town meeting, Graiff acknowledged that Verizon's engineer responded to

his concerns about pilot pollution by assuring him that "it wasn't going to be an issue with pilot

power . . . . [and] [h]e would be able to handle that by reducing the pilot power so that he

wouldn't have the pilot interference."  (Admin. R. 686.)  The July 10, 2012 Minutes of the Town

meeting also note that "Graiff was delighted that [Verizon's RF Engineer] is positive about [the

pilot pollution] issues and feels that he can adjust the system with the cell sites located so closely

together."  (*Id.* at 530.)

      The foregoing reasons do not meet the substantial evidence standard that the TCA

requires, nor do they support a finding that Plaintiffs failed to show "an actual need for

construction of the new tower" under the Code.  (Code § 194-82(c).)  To summarize, no

evidence supports the Board's conclusory claim that the gap was based on Verizon's corporate

standard of coverage, nothing in the Code requires Plaintiffs to show evidence of dropped calls

or poor service, and this lack of evidence, without more, does not discredit Plaintiffs' expert

submissions and testimony, and the Board's reliance on Graiff's opinions as to pilot pollution—a

separate issue from whether a gap in coverage exists—is misplaced.  After an "evaluation of the

entire record, including opposing evidence," the Court concludes that the evidence that the Board

cites to find that no significant gap in coverage exists amounts to, at most, a "scintilla."  *Willoth*,

176 F.3d at 638.  For the same reasons, the Court finds that Plaintiffs established "that there are

gaps in service" along the targeted area, and that "the location of the proposed [F]acility will

remedy those gaps," as required by State law.  *Vill. of Floral Park*, 812 F. Supp. 2d at 154

(quoting *Site Acquisitions, Inc.*, 770 N.Y.S. 2d at 160) (internal quotation marks omitted).[12]

### b.  Danger of a Single Carrier Tower

The Code sets forth "design and construction requirements" that "[n]ew or modified

commercial telecommunication towers and antenna installations" must meet.  (Code § 194-

84(A).)  One such requirement is to "[a]llow collocation in the future."  (*Id.* § 194-84(A)(1).)

Specifically:

> An applicant proposing to place a new tower shall cause it to be designed in a
> manner which will accept collocation of other commercial telecommunications
> antenna installations in the future . . . Towers must be designed to allow for future
> rearrangement of antennas upon the tower, and to accept antennas mounted at
> varying heights.  The applicant shall document the tower's capacity including the
> number and type of antennas it can accommodate and potential mounting
> locations.

(*Id.*)  Moreover, "[w]here practicable, towers should be designed and constructed in a manner

which will accommodate future collocation."  (*Id.* § 194-94(A)(3).)  The Code also cautions that

"[s]pecial permits are to be based on actual need, and not on speculation of possible future needs

which may or may not materialize."  (*Id.* § 194-80(A)(1).)

In denying Plaintiffs' Application, the Board concluded that it "has been advised that a

significant danger exists for a single carrier tower."  (Admin. R. 1477.)  The Board explained

that "[i]t appears that collocation, as presented by the Applicant throughout the review and

public hearing process, is *not* feasible due to topographic considerations."  (*Id.* at 1478.)  In

making this determination the Board relied on conclusions in the Initial RF Analysis, which

---

[12] Defendants do not contest that the Site remedies the gap in coverage that Plaintiffs

explained that a center line lower than 146 feet AGL "would limit the coverage due to the terrain blockage and the surrounding foliage . . . and the terrain would significantly weaken the RF signal," and Plaintiffs' propagation maps, "which show declining to zero coverage to the target area at heights below the 146' center line." (*Id.* at 1477.)  The Board also cited the fact that Homeland offered to permit the Board to approve a tower that could rise above 150 feet as evidence that collocation was not realistic.  (*Id.* at 1478.)  Moreover, based on Verizon's documentation demonstrating that to achieve full coverage at the Site Verizon's antennas must be placed at 146 feet AGL, the Board reasoned that other carriers likely would not achieve full coverage below 146 feet AGL.  (*Id.*)  To buttress its reasoning before this Court, Defendants rely on the FCC RF Compliance Assessment Report to show other providers use similar frequencies as Verizon, (*id.* at 71, 74, 79), and point out that although the report assumed the providers would be located at various heights below 146 feet AGL, there is no evidence in the record that these are feasible mounting positions for collocation of these providers, (Defs.' 56.1 ¶ 27).

The difficulty with the Board's analysis is that it alters the conditions that the Code requires an applicant to meet, and imposes additional evidentiary obligations on an applicant that the Code does not contemplate, and indeed, may disfavor.  As an initial matter, the Code requires that an applicant "*[a]llow* collocation in the future," not guarantee it.  (Code § 194-84(A)(1) (emphasis added).)  In the Application, Homeland submitted a letter confirming that it will coordinate to rent or lease available space on the Monopole to other telecommunications

---

identify.

providers in the future, under the terms of a fair market lease, (Admin. R. 30, 128), and Homeland confirmed that commitment in a letter dated March 25, 2013, (*id.* at 1209.)

Moreover, the Code focuses on the design and construction of the proposed tower to accommodate future collocation, not on whether a proposed tower or its location is currently suitable to meet the future needs of other providers.  The requirement provides that "[t]owers must be designed to *allow* for future rearrangement of antennas upon the tower, and to *accept* antennas mounted at varying heights."  (*Id.* § 194-84(A)(1) (emphasis added).)  Further, "[t]he applicant shall document the tower's *capacity* including the number and type of antennas it *can* accommodate and *potential* mounting locations."  (*Id.* (emphasis added).)  Through drawings, a letter from a New York State licensed Professional Engineer, the FCC RF Compliance Report, and an affidavit from the president of Homeland submitted to the Board, Plaintiffs demonstrated that the Facility is designed to accommodate the collocation of up to five additional commercial antennas, and documented potential mounting locations.  (Admin. R. 119, 128, 443–44, 447–48, 601–02.)  Nothing more under the Code, or for that matter state law, is required.  *See Douglas Cnty, Kan. Bd. of Cnty. Comm'rs*, 544 F. Supp. 2d at 1245 (holding that a denial is not based on substantial evidence if it "imposes a burden upon [the plaintiff] to prove facts for which there is no requirement under state or local law").

The Court also notes that an interpretation of the Code that would mandate an applicant to demonstrate that collocation is not only structurally feasible, but also to prove that other providers could collocate on a proposed tower, would present logistical and legal concerns. Plaintiffs advised the Board that requiring them to "predict" the coverage for all other carriers at

a given location "is a request that a carrier simply cannot satisfy." (Admin. R. 1209.) Specifically, Plaintiffs explained that "[e]ach carrier has a unique network, which may utilize different signal 'hand-off' sites, locations and heights," and the "location of another carrier's nearest site may not be the same as Verizon, and/or may be placed at different heights and experience different topographic or vegetative limitations," as "each carrier's siting needs (i.e., height in a given location) are specific to their service and coverage objectives." (*Id.*) Graiff confirmed that questions as to whether the Monopole would have to be higher for collocation in the future were questions that can only be answered by another applicant. (*Id.* at 1457.) Moreover, a requirement that an applicant demonstrate a proposed tower could support the frequency needs of other providers may turn on "technical and operational matters, over which the FCC and the federal government have exclusive authority." *Town of Clarkstown*, 612 F.3d at 106 (citation omitted).

Finally, the Board bases its collocation argument on § 6409 of the Middle Class Tax Relief and Job Creation Act of 2012 ("Tax Relief Act"), which provides that "a State or local government may not deny, and shall approve, any eligible facilities request for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station." 47 U.S.C. § 1455(a)(1). The statute, in turn, defines "eligible facilities request[s]," as "any request for modification of an existing wireless tower or base station that involves—(A) collocation of new transmission equipment; (B) removal of transmission equipment; or (C) replacement of transmission equipment." *Id.* § 1455(a)(2).

60

Defendants hypothesize that "once the Tower [i]s constructed, and col[l]ocation above 146 feet is not feasible, the Applicant may request approval to locate any number of additional antenna arrays on the Tower and to increase the height of the Tower up to the legal limit." (Defs.' Mem. 10.)  This assertion, however, is contrary to the plain text of the statute, which provides that a board may deny a request if it "substantially change[s] the physical dimensions of [the] tower or base station."  47 U.S.C. § 1455(a)(1).  Moreover, although the FCC's recently developed guidance on what constitutes a "substantial change" for purposes of § 6409 circumscribes the Board's authority to deny a proposed modification, the Board still retains the ability to do so under certain conditions.  *See* FCC, Rep. & Order, 14-153 ¶ 188 (Oct. 17, 2014). Further, speculation based on what may or may not happen in the future cannot provide substantial evidence for denying the Application, and conflicts with the Code's mandate that "[s]pecial permits are to be based on actual need, and not on speculation of possible future needs which may or may not materialize."  (Code § 194-80(a)(1).)  Accordingly, the Court concludes that the Board did not base its decision on substantial evidence to find that Plaintiffs failed to demonstrate that the Facility is designed for collocation, as required by the Code.

### c.  Aesthetic Effect

The Code also provides that "[a] new tower shall, to the extent possible, be sited distant from residential properties, and where visual impacts upon residential properties can be minimized."  (Code § 194-80(A)(11)(b).)  Moreover, the applicant must demonstrate that "the proposed antenna installation or tower will not have a significant adverse impact on scenic resources identified in [the Code] or on historic resources," and "[i]f a significant adverse visual

impact is identified, the applicant shall demonstrate that suitable landscaping, buffering[,] or other techniques will be used, and they are able to minimize such impacts to a level of insignificance." (*Id.* § 194-82(F).)  The visual resources identified by the Code include "[v]iews to or from the Appalachian or National Scenic Trail[,] [v]iews from Shenandoah, Route 52, the Taconic Parkway[,] and 1-84 to Hosner Mountain[,] [v]iews from Route 52 and 1-84 to Stormville Mountain[, and] [v]iews from Route 52 and I-84 to the mountains of Wiccopee." (*Id.* § 194-79(B)(7).)

In the Denial, the Board concluded that "[b]ased upon a review of the various Site Plans, actual photographs, and visual projections the [Facility] will be *highly intrusive* to the communities affected." (Admin. R. 1479.)  Specifically, the Board explained that: (1) the Facility "can be seen from numerous vantage points;" (2) "the [T]ower will stand approximately [three] times the height of the tallest existing tree;" (3) the Tower "will *not* be disguised as a tree or flagpole, and will be an eyesore in mature, residential neighborhoods . . .;" (4) "numerous trees will be cut down, thus making the [Facility] even more visible from a number of locations . . . including those directly across the Taconic State Parkway;" and (5) the Tower "will impact the viewshed of the [Taconic State Parkway][,]" which is a "nationally designated Scenic Byway." (*Id.* at 1479–80.)

In evaluating a denial of a permit pursuant to the TCA, a court "can find that aesthetics qualify as a permissible grounds for denial of a permit only if [it] can conclude that there was more than a scintilla of evidence before the Board on the negative visual impact of the cell sites." *Town of Oyster Bay*, 166 F.3d at 495 (citation and internal quotation marks omitted).  In other

words, "aesthetic concerns must be grounded in substantial evidence in the record." *SMSA Ltd.
P'ship*, 2013 WL 4495183, at *14.  Objections based on aesthetic grounds should be
"articulate[d] specifically," and cannot be premised on a "few generalized expressions of
concern." *Town of Oyster Bay*, 166 F.3d at 495–96.  The Court finds that although the Board
articulated specific objections to the Facility on aesthetic grounds, those objections were
nevertheless not grounded in substantial evidence before the Board.

Defendants rely on *Omnipoint Communications, Inc. v. City of White Plains*, 430 F.3d
529 (2d Cir. 2005) to support their determination that it was proper to deny the Application on
aesthetic grounds.  In *White Plains*, the Second Circuit held that a zoning board's rejection
because of the aesthetic impact of the proposed facility was "based on reasonable and substantial
evidence" because "[g]iven the [proposed] 150-foot tower would rise to three times the height of
the tallest evergreen tree and would be half again as tall as any other tree in the area, the [b]oard
could reasonably conclude (especially given express testimony to that effect) that the tower
would be widely visible, [and] . . . the [b]oard received substantial evidence of the tower's
adverse impact." *Id.* at 533.  The Second Circuit disagreed with the plaintiff's contention that
"the [b]oard erroneously focused on the statements by agitated neighbors and their expert, rather
than on the testimony of [the plaintiff's] expert and her visual impact study." *Id.*  It concluded,
instead, that the board "was free to discount [the plaintiff's] study because it was conducted in a
defective manner," specifically, "without notice to the [b]oard or community, the observation
points upon which its conclusion was based were limited to locations accessible to the public—
mostly public roads[,]—[] no observations were made from the residents' backyards, and the

study . . . failed to consider the tower's visibility in winter, when deciduous trees are bare." *Id.* Further, the court explained that "[t]he [b]oard was not bound to accept [the plaintiff's] testimony simply because . . . it was insufficiently contested by properly credentialed expert testimony[,]" and the residents' visual impact study . . . prepared by a landscape architect with limited qualification for [the] task" was sufficient as "the residents were not required to offer any expert testimony at all." *Id.* Finally, the court determined that the board did not give "improper deference to community opposition" over the plaintiff's expert testimony because "[t]hough a [b]oard is not required to give decisive weight to one over the other, Congress has definitely provided it the ultimate voice in the zoning decision-making process." *Id.* at 534.

The Court agrees with Defendants that there are some similarities between this case and *City of White Plains*. Although it is unclear from the record whether "the [T]ower will stand approximately [three] times the height of the tallest existing tree," (Admin. R. 1479), there is no doubt that the Tower will extend at least up to 75 to 85 feet above the tree line, (Defs.' 56.1 ¶ 39; *see* Admin. R. at 1389–90).[13]   Accordingly, this is not a case where "[i]t is not clear if residents will be able even to see the antennae," *Town of Oyster Bay*, 166 F.3d at 495, but rather, the Tower here, like the tower at issue in *White Plains*, will rise above the tree line.  This fact alone, however, did not end the Second Circuit's inquiry as to whether the board's decision was supported by substantial evidence, and it does not end the inquiry here.

The Board stated that it based its conclusion that the Facility would be "highly intrusive" to the communities affected on the Site plans, actual photographs, and visual projections in the

---

[13] There is no dispute that the tree height is 65 to 75 feet.  (Admin. R. 1157, 1390).

record.  All but a few of the photographs in the record, and all of the Site plans and visual

projections, were offered by IVI, Plaintiffs' expert, or Allen, the expert at Saratoga retained by

IVI to review the VRE and Janes's conclusions.  (Admin. R. 234–93, 493–96, 1230–58, 1412–

14.)  The Board was clearly entitled, and indeed should have, relied on such submissions in

evaluating the aesthetic impact of the Tower.  The Board's finding based on these materials,

however, was the exact opposite of the experts that submitted them.  IVI's report concluded that

the Facility "will not adversely impact visual resources," and found that "there will be minimal

visibility of the [Facility] due to the variations in terrain, natural and man made obstructions and

significant tree cover."  (*Id.* at 241.)  Further, "[a]t the small number of viewpoints where the

[Facility] will be visible, either intervening tree cover will limit the aesthetic effect of the

proposed [Facility] or the [Facility] will be at such a significant distance from the viewpoint so

as to limit the visual impact."  (*Id.*)  Allen concluded that "the project will be well screened by

the intervening landform and vegetation for all sensitive visual resources resulting in no adverse

visual impact, . . . [and] [a]lthough isolated views may occur above intervening trees, views from

neighboring properties will be substantially screened by forest cover and understory vegetation

during leafless winter months and fully screened during the summer months."  (*Id.* at 1246–47.)

Allen also testified that he had "never seen an application with a less visual impact than this

one . . . because of the trees in the way driving down the Taconic, driving down the residential

streets, [he] didn't find a single point of view where the tower would be visible anywhere except

through the trees."  (*Id.* at 1411 (DVD at 54:36–54).)  Nevertheless, based on the same material,

the Board concluded the Facility would be "highly intrusive."

There is no doubt under *White Plains* that the Board was free to discount Plaintiffs'
experts' studies and conclusions if the studies were conducted in a defective manner, or if other
substantial evidence in the record, like testimony from the Town's residents familiar with the
area, supported a different conclusion.  *See White Plains*, 430 F.3d at 533–34.  Here, there were
suggestions from Janes that the study was defective.  Janes was critical of IVI's methodology on
the grounds that the photograph quality of the locations was poor and not in accordance with
industry standards, and thus concluded that the VRE could not "be used as an assessment of the
project's impact."  (Admin. R. 691.)  While the Board, again, was free to credit this assessment
over Allen's conclusion that the VRE could be used to make a determination of visual
significance, (*id.* at 1243–44), it did not.  Instead, it used the VRE and other documents
submitted by IVI and Allen to reach its conclusion that the Facility is highly intrusive, even
though Janes never challenged the VRE's finding of "no significant impact."  (*See id.* at 1246.)

Moreover, unlike the defendant Board in *White Plains*, the Board here was aware of the
planned tests.  *See Town of Fenton*, 843 F. Supp. 2d at 250 (distinguishing *White Plains* by
noting that the wireless provider "did provide advance notice of the balloon test").  Plaintiffs
requested to introduce the Facility to the Board, determine the vantage points that should be
considered in the VRE, and set a schedule for a visual test in accordance with the Code.  (Admin.
R. 13.)  The Board, in turn, authorized Plaintiffs to proceed with conducting the viewshed
assessment, including the requisite balloon test.  (Pls.' 56.1 ¶ 144; Admin. R. 211.)  The Court in
*White Plains* also found it significant that the expert's test did not show the trees during the
winter months, whereas the tests here were completed "in a worst case, 'leaf off' condition so

66

that for much of the year, any potential visibility will be even further minimized or removed." (Admin. R. 494.)  *See Town of Fenton*, 843 F. Supp. 2d at 250 (finding it relevant that unlike the plaintiff in *White Plains*, the plaintiff "provide[d] a photo simulation of the site from which the cell tower would be most visible . . . when the deciduous trees were bare").

The Court acknowledges that the Board may have had legitimate reasons for discrediting or otherwise refusing to rely on the experts' conclusions in the record.  Indeed, as in *White Plains*, here there were "aesthetic objections raised by neighbors who know the local terrain and the sightlines of their own homes."  430 F.3d at 534.  (*See* Admin. R. 701–06.)  The Board, however, was at the very least required to specify such reasons or indicate the comments it may have relied on before citing the experts' submissions and reaching the opposite conclusion.  *See SMSA Ltd. P'ship*, 2013 WL 4495183, at *15 (noting that "the [b]oard is allowed to discount expert opinions, but it must rely on substantial evidence in the actual record in order to do so"); *Town of Fenton*, 843 F. Supp. 2d at 251 (concluding that "the *White Plains* case is distinguishable from the instant action, and does not support a finding that substantial evidence supported the decision of the [t]own . . . to ignore the results of the [plaintiff's] balloon test and other expert analysis in evaluating the aesthetic impact of the proposed project"); *Vill. of Floral Park*, 812 F. Supp. 2d at 157 ("Viewing the record in its entirety, the [c]ourt finds that the [b]oard's denial on the grounds that the [f]acility is 'not in keeping with the overall characteristics of the [v]illage,' which ignored the expert testimony, technical reports, and data concluding that the [f]acility would blend in with . . . the surrounding neighborhood . . . , is not supported by substantial evidence."); *Sprint Spectrum L.P. v. Town of N. Stonington*, 12 F. Supp.

67

2d 247, 254 (D. Conn. 1998) (holding that the board must support its basis for disregarding the plaintiff's expert report).  Additionally, unlike the proposed Facility in *White Plains* that was to be located on a local golf course, *see White Plains* 430 F.3d at 530, here the proposed Facility will be surrounded by trees and vegetation.

Furthermore, the Court notes that many of the Board's purported reasons for denying the Application on aesthetic grounds are contrary to the evidence in the record.  As already discussed above, Defendants conceded at oral argument that the Board did not request that the Tower be disguised as a flagpole or an evergreen.  (Hr'g Tr. 57.)  Moreover, the Board's claim that numerous trees would be cut down, which would make the Facility even more visible, is undermined by Plaintiffs' unrebutted evidence in the record that the construction would only require that 59 trees—the majority of which a less than 20 inches in diameter—be cut down. (Admin. R. 1389.)  Finally, as to the potential impact of the Facility on the Taconic State Parkway, Plaintiffs assured the Board that the Site "will be setback a substantial distance from certain scenic areas and ridge lines identified in the Code, including the intersection of Route I-84 and the Taconic State Parkway, the Appalachian National Scenic Trail, Hosner Mountain, Stormville Mountain, and the Mountains of Wiccopee." (*Id.* at 124–25.)  Indeed, the SHPO found that there would be no adverse effect on historic properties from the Facility, which includes the Taconic State Parkway.  (*Id.* at 498, 500.)

The Court concludes, then, that the Board's decision to deny the Application based on aesthetic grounds is not supported by substantial evidence in the record.

d.  Property Values

The Code also requires that, before issuing a special permit, the Board make findings that

that the proposed Facility "will be in harmony with the appropriate and orderly development of

the district in which it is located . . . will not hinder or discourage the appropriate development

and use of adjacent land and buildings," and that the "[n]eighborhood character and surrounding

property values shall be reasonably safeguarded."  (Code § 194-44(A),(B),(D).)  The Board

found that Plaintiffs failed to meet this requirement because, among other things, the Facility

would cause a devaluation in property values.

The only evidence that the Board points to in the record are the two competing reports of

Serino, a local real estate broker, and Plaintiffs' expert, Ferrarone, described above.  According

to the Denial, Serino opined that property values "decline approximately 20% in areas where a

cell tower exists."  (Admin. R. 1480; *see id.* at 815.)  Serino based his conclusion on the

perception among potential buyers that a health risk exists and on the adverse aesthetic impact.

(*Id*. at 815.)  In turn, the Ferrarone report concluded that the Facility would not result in the

diminution of property values based on his "ongoing study of sales of homes within a close

proximity of similar communications facilities in Westchester, Putnam[,] and Rockland

Counties."  (*Id.* at 1261.)

The Court finds the Second Circuit's decision in *Cellular Telephone Co. v. Town of

Oyster Bay* helpful as to whether the Board relied on substantial evidence to support its

conclusion that property values would diminish.  In *Oyster Bay*, the board relied on a real estate

broker's "affidavit stating that the presence of cell sites would depress real estate values of

69

nearby property in a manner similar to the drop in value caused by the presence of high tension power lines," but "offered no evidence other than her unsupported affidavit to prove how she reached this conclusion." 166 F.3d at 496. The board in *Oyster Bay* also relied on resident concerns about a decline in the value of their homes, which the plaintiff alleged and the record supported "were a result of their fear of . . . related health effects." *Id.* The Second Circuit noted that the "evaluation of property value evidence under the TCA raises some difficult questions," like the weight to afford citizens views on a matter that could be objectively proven and whether "the TCA bars reliance on fear of declining property values because this rationale is actually a proxy for the impermissible ground of environmental effects." *Id.* Here, the Serino Affidavit raises the same concerns.

The Second Circuit concluded, though, that it "need not resolve these troubling questions[,]" because the "volume and specificity of the comments were not adequate to satisfy the requirements of the substantial evidence standard." *Id.* Like the court in *Oyster Bay*, this Court concludes that Serino's "generalized concerns about a potential decrease in property values, especially in light of [Plaintiffs'] contradictory expert testimony, does not seem adequate to support a conclusion." *Id.* (internal quotation marks omitted). Moreover, here the proposed Site is near "four large ham radio towers in the neighborhood[,]" (Admin. R. 1401), and neighbors opposing the Application acknowledged that the ham towers existed on property along Dartantra Drive at the time they purchased their homes, (*id.* at 700–02). The Board's decision to deny the Application on property value grounds is, therefore, not supported by substantial evidence. For similar reasons, the Court finds that the Facility "presents a minimal intrusion on

70

the community[,]" as required by State law.  *Vill. of Floral Park*, 812 F. Supp. 2d at 154 (quoting

*Site Acquisitions, Inc.*, 770 N.Y.S.2d at 160) (internal quotation marks omitted).

### 3.  Article 78

Having found that the Board's Denial is not supported by substantial evidence under the

TCA, the Court finds that the denial is also unsupported by substantial evidence and is therefore

arbitrary and capricious under Article 78.  *See id.* at 167; *Town of LaGrange*, 658 F. Supp. 2d at

558.

### C.  Remedy

As mentioned above, although the TCA does not identify a specific remedy for violations

of the effective prohibition provision, "the majority of district courts that have heard these cases

have held that the appropriate remedy is injunctive relief in the form of an order to issue the

relevant permits."  *Inc. Vill. of E. Hills*, 779 F. Supp. 2d at 275 (internal quotation marks

omitted); *see also Town of Ramapo*, 701 F. Supp. 2d at 463 ("[U]nder *Willoth*, a violation of the

effective prohibition provision requires injunctive relief: an application proposing the least

intrusive means for closing a significant coverage gap cannot be denied—or, put differently, it

must be granted" (citation, alteration, and internal quotation marks omitted)).  Similarly, if "the

public utility makes the required showing [under state and local law], which necessarily means

the record is devoid of substantial evidence to support a denial, the variance must issue."  *Vill. of

Floral Park*, 812 F. Supp. 2d at 154 (citing *Town of LaGrange*, 658 F. Supp. 2d at 555).  Here, as

the Board's Denial violates the effective prohibition provision and the Court cannot find "even

one reason given for the [D]enial [that] is supported by substantial evidence," *N.Y. SMSA L.P.*,

2010 WL 3937277, at *4, the Court finds that an order to issue the special permit with the variances that Plaintiffs request is appropriate.

## III.  CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is granted.  The Court orders that the Board shall, within thirty days of the date of this Order, grant the Application and issue the special use permit and such other permits or licenses which are necessary to effectuate the construction of the Facility that is the subject of this Action.  The Clerk of the Court is respectfully requested to terminate the pending motion, enter judgment for Plaintiffs, and close the case.  (*See* Dkt. No. 20.)

SO ORDERED.

Dated: January 3 0, 2015
        White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE